In re John J. STEWART, Jr., Debtor.

Susan Woodard, Trustee, and Barbara Stewart, Plaintiffs,

v.

John J. Stewart, Jr., Cheryl Stewart, and Charles Schwab Brokerage, Defendants.

Susan K. Woodard, Trustee, Plaintiff,

v.

John J. Stewart, Jr., an individual, Cheryl Ann Stewart, an individual, and John J. Stewart, Jr. and Cheryl Ann Stewart, as parents and natural guardians of William Stewart, a minor, Defendants.

Bankruptcy No. 96–1005–8G7.
Adversary Nos. 96–850, 96–900.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 1, 2001.

Reconsideration Denied April 5, 2002.

John J. Stewart, Jr., Jackson, WY, pro se.

Bernard Morse, Morse, Berman and Gomez, Tampa, FL, for Barbara Stewart.

Guillermo A. Ruiz, St. Petersburg, FL, for Cheryl Stewart and William Stewart.

Curran K. Porto, Meininger, Bianco & Porto, P.A., Tampa, FL, for trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned proceeding.

Barbara Stewart is the former wife of the Debtor, John J. Stewart, Jr. In 1994, Barbara Stewart filed an action against the Debtor in the Circuit Court for Pinellas County, Florida to recover assets that the Debtor allegedly had fraudulently transferred to Cheryl Stewart, the Debtor's current wife.

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on January 26, 1996. On August 16, 1996, Barbara Stewart's state court action was removed to the Bankruptcy Court, and was assigned Adversary Number 96–850.

On August 30, 1996, Susan K. Woodard, the Chapter 7 Trustee, filed a Complaint in the Bankruptcy Court for turnover, to recover fraudulent transfers, and to revoke the Debtor's discharge. The Defendants named in the Trustee's action were the Debtor and Cheryl Stewart, individually, and also as guardians of their minor son, William Stewart. The Trustee's action was assigned Adversary Number 96–900.

On March 27, 1997, the Court entered an Order consolidating the removed action initially commenced by Barbara Stewart in state court (Adversary Number 96–850), and the action commenced by the Chapter 7 Trustee in Bankruptcy Court (Adversary Number 96–900). The Court consolidated the two actions for purposes of discovery, pretrial proceedings, and trial. (Order on Motion to Consolidate or Alternatively Leave to Amend Complaint to Include All Fraudulent Conveyances, Doc. 12).

### Background

The Debtor and Barbara Stewart were married in the early 1960's and had four children together. (Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, p. 5). The Debtor is a medical doctor who specialized in ophthalmic surgery. (Barbara Stewart's Exhibit 1, Deposition transcript of John Stewart, pp. 13–14) The Debtor no longer practices medicine, however, due to a medical disability. (Barbara Stewart's Exhibit 1, Deposition transcript of John Stewart, p. 15).

The Debtor and Barbara Stewart were divorced in 1982. At the time of the divorce, and for years thereafter, the Debtor was not obligated to make periodic alimony or support payments to Barbara Stewart in any established amount. The parties' agreement provided only that the Debtor would make such payments as were "reasonably necessary" for Barbara Stewart's support and maintenance. (Barbara Stewart's Exhibit 4, Order, p. 1).

Following years of litigation, the state court in the divorce action entered an Order on August 2, 1994, which provided that "commencing 2/10/94 the permanent periodic alimony payable by John Stewart to his former wife, Barbara Stewart be modified and shall be $6,500.00 per month, until the death of either party or remarriage of the former wife." (Barbara Stewart's Exhibit 4, Order, p. 20).

The Debtor filed a petition under chapter 7 of the Bankruptcy Code on January 26, 1996. Barbara Stewart subsequently

filed a proof of claim (Claim No. 2) in the chapter 7 case in an amount "in excess of $1,250,000.00." According to the attachment to the claim, the amount represented the current present value of the future payments of alimony or support due from the Debtor.

On November 30, 1998, the Court entered an Order on Objection to Claim of Barbara Stewart and Motion to Liquidate Claim of Barbara Stewart. (Case No. 96–1005–8G7, Doc. 143). In the Order, the Court sustained the Trustee's Objection, and disallowed the claim "without prejudice to Barbara Stewart's claims against the Debtor or any transferee of the Debtor's property that is not property of the bankruptcy estate."

At the final hearing in this proceeding, Barbara Stewart testified that the amount of the support arrearage owed to her by the Debtor as of May of 2001 was $63,962.96. (Transcript of May 22, 2001, Final Evidentiary hearing, p. 212).

The only claim filed by a third party in the Debtor's bankruptcy case is the unsecured claim of Barnett Bank of Pinellas County in the amount of $78,466.83. (Claim No. 1).

### Adversary Number 96–900

#### A. The parties.

The only Plaintiff in this action is the Chapter 7 Trustee, Susan K. Woodard. The Defendants are the Debtor and Cheryl Stewart, both individually and as guardians of their minor son, William.

No evidence was presented, however, to establish any transfers of property from the Debtor to William Stewart. With respect to Counts IV, V, and VII of the Trustee's Amended Complaint, therefore, a Final Judgment should be entered against the Trustee and in favor John J. Stewart, Jr. and Cheryl Stewart as guardians of William Stewart.

#### B. The statutes.

The Trustee alleges that Count II of her Amended Complaint, entitled "Constructive Fraud," is based on § 548(a)(2) of the Bankruptcy Code, and also on § 726.105(1)(b) of the Florida Statutes, as made applicable to the proceeding by § 544(b) of the Bankruptcy Code.

The Trustee alleges that Count III of her Amended Complaint, entitled "Actual Fraud," is based on § 548(a)(1) of the Bankruptcy Code, and also on § 726.105(1)(a) of the Florida Statutes, as made applicable by § 544(b) of the Bankruptcy Code.

■ Section 548(a)(1) and § 548(a)(2), currently § 548(a)(1)(A) and § 548(a)(1)(B) of the Bankruptcy Code, provided:

### 11 U.S.C. § 548. Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in busi-

ness or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Section 726.105(1) of the Florida Statutes provides:

**726.105. Transfers fraudulent as to present and future creditors**

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The bankruptcy statute and the state statute are analogous "in form and substance," and may be analyzed contemporaneously. *In re Venice–Oxford Associates Limited,* 236 B.R. 820, 834 (Bankr.M.D.Fla.1999)(quoting *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir.1991)).

**C. The limitations period.**

Section 726.110 of the Florida Statutes provides:

**726.110. Extinguishment of cause of action .**

A cause of action with respect to a fraudulent transfer or obligation under ss. 726.101–726.112 is extinguished unless action is brought:

(1) Under s. 726.105(1)(a), within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant;

(2) Under s. 726.105(1)(b) or s. 726.106(1), within 4 years after the transfer was made or the obligation was incurred.

On September 8, 2000, the Court entered an Order on the Trustee's Motion for Summary Judgment. (Doc. 79). In that Order, the Court concluded that the Trustee "may not look back to transfers four years prior to the filing of Barbara Stewart's lawsuit, or November, 1990, for potential fraudulent transfers to the Defendants from the Debtor." Pursuant to the Order, therefore, the Trustee acknowledges that she may only seek to avoid transfers that occurred within the four-year period between 1992 and 1996, as provided by § 726.110 of the Florida Statutes.

**D. The evidence.**

The Trustee asserts that the Debtor made a series of transfers to Cheryl Stewart between 1992 and 1996 in the aggregate amount of $392,691.56. The Trustee further contends that the transfers are evidenced by deposits or additions to various securities accounts owned by Cheryl Stewart.

To establish this contention, the Trustee presented the testimony of Larry Hyman (Hyman), a certified public accountant.

First, Hyman testified that he had examined the Debtor's federal income tax returns for 1992, 1994, and 1995. Based on his review, Hyman estimated that the Debtor's total income for the four-year period from 1992 to 1996 equaled $801,381.00. (Transcript of May 22, 2001, Final Evidentiary Hearing, p. 73)(hereafter referred to as "Transcript").

Second, Hyman testified that he had examined Cheryl Stewart's federal income tax returns for 1992, 1994, and 1995. Based on his review, Hyman estimated that Cheryl Stewart's total income for the four-year period from 1992 to 1996 equaled $60,550.00. (Transcript, p. 72).

Finally, Hyman testified that he had examined statements for the following securities accounts owned by Cheryl Stewart: (1) Charles Schwab—1992, 1993, 1994, 1995, and January 1996; (2) Fidelity Investments—1994 through 1997; (3) Waterhouse Securities—1993 through 1996; (4) The Benham Group—1993 through 1996; (4) T. Rowe Price—1992 through 1996; and (5) The Vanguard Group—1991 through 1996. (Transcript, p. 62).

According to Hyman, he examined the account statements to determine the extent to which "new money" or money from a "foreign source" was deposited into the accounts. To determine the amount of "new money" added to the accounts, therefore, Hyman disregarded increases in the funds that were generated from within the accounts themselves, such as dividends that were reinvested or interest that was attributed to the existing funds. Hyman concluded that the aggregate amount of new money from foreign sources that was deposited into all of the accounts equaled $453,241.56. (Transcript, p. 72).

From this sum, Hyman subtracted the amount of $60,550.00, which represented Cheryl Stewart's rental income and wage income for the four years at issue. The difference between the "foreign source" money in the securities accounts, and Cheryl Stewart's aggregate income for four years, equaled $392,691.56. (Transcript, p. 72).

The deposits into Cheryl Stewart's securities accounts in the total sum of $392,691.56 are not explained by the entries on the account statements. The Trustee apparently concludes, therefore, that the funds must necessarily have originated from the Debtor. The Trustee points to the Debtor's income for the four years in question, for example, to show that he had the financial means or the financial wherewithal to supply the funds.

No other evidence was presented to establish that the Debtor transferred the sum of $392,691.56 to Cheryl Stewart. Under these circumstances, the Court finds that the Trustee has not proven the existence of a transfer of property of the Debtor by a preponderance of the evidence.

The deficiency of the evidence is shown by Hyman's concession on cross-examination that he could not determine the source of any specific deposit into the securities accounts. (Transcript, p. 80). Hyman further conceded that the source of the deposits could be from property of Cheryl Stewart other than her income (Transcript, p. 81), and that he did not examine any document, paper, or thing that caused him to believe that Cheryl Stewart received money from the Debtor between 1992 and 1995. (Transcript, p. 83).

The Trustee has not established the existence of any transfer of the Debtor's interest in property as required by § 548 of the Bankruptcy Code or § 726.105 of the Florida Statutes.

### E. Revocation of discharge.

The Trustee alleges in Count VIII of her Amended Complaint that the Debtor's

discharge should be revoked pursuant to § 727(d) of the Bankruptcy Code. To support the request, the Trustee asserts that the Debtor failed to disclose assets that were "maintained" by him, but which were held in Cheryl Stewart's accounts. As shown above, however, the Trustee did not prove that any funds contained in Cheryl Stewart's securities accounts had been transferred to her by the Debtor. Accordingly, the Trustee has not established that the Debtor's discharge should be revoked.

### Adversary Number 96–850

#### A. The parties.

On November 30, 1998, the Court entered an Order on Motion for Summary Judgment. (Doc. 33). According to the Order, the Trustee is the Plaintiff in Adversary No. 96–850 "for all matters which affect, or otherwise relate to the estate or property of the estate to the extent necessary to pay all claims against the estate." Barbara Stewart, however, "shall remain party plaintiff in interest as relates to any potential recovery in excess of that necessary to satisfy all claims against the estate."

The Defendants named in the action are John J. Stewart, Jr., Cheryl Stewart, and Charles Schwab Brokerage. On March 13, 2001, the Court entered an Order on Motion for Entry of Default or in the Alternative to Establish Deadline for the Filing of Defendant's Answer. (Doc. 91). In the Order, the Court directed John J. Stewart, Jr. to file and serve an Answer or other appropriate response to the Amended Verified Complaint for Fraudulent Conveyance no later than March 26, 2001. On April 23, 2001, the Court entered an Order on Status Conference, which directed all Defendants in the action to file an Answer within twenty days of the date of the Order, if they had not already done so. The Debtor, John J. Stewart, Jr., neither filed a written answer as directed by the Court, nor appeared at the final hearing conducted on May 22, 2001. Accordingly, at the final hearing, Barbara Stewart requested that the Court enter a default against the Debtor.

Based on the oral motion and the record in this proceeding, the Court determined that a default should be entered against the Debtor, John J. Stewart, Jr. (Transcript, pp. 87–88).

#### B. The statute.

Prior to the removal of this action to the Bankruptcy Court, Barbara Stewart filed an Amended Verified Complaint for Fraudulent Conveyance dated June 16, 1995, "in compliance with Florida Statute 726." The Amended Verified Complaint dated June 16, 1995, is the operative pleading in the removed action.

The Amended Verified Complaint does not identify a particular subsection of "Florida Statute 726" upon which the action is based. Barbara Stewart alleges, however, that the Debtor had made transfers to Cheryl Stewart with the intent to defraud a creditor, and also that the Debtor made the transfers without receiving reasonably equivalent value in return. Consequently, it appears that the Amended Verified Complaint, as drafted, is based on both § 726.105(1)(a) and § 726.105(1)(b) of the Florida Statutes.

#### C. The limitations period.

The focus of this proceeding rests on transfers allegedly made from certain Charles Schwab accounts owned by the Debtor or by the Debtor and Cheryl Stewart as tenants by the entireties, to certain other Charles Schwab accounts owned by Cheryl Stewart individually. The alleged transfers occurred in 1988 and 1989.

As set forth above, the limitations period for actions under § 726.105(1)(a) of the

Florida Statutes is "4 years after the transfer was made" or, if later, within one year after the transfer "was or could reasonably have been discovered." The limitations period for actions under § 726.105(1)(b) of the Florida Statutes is "four years after the transfer was made." Fla. Stat. § 726.110.

In this case, Barbara Stewart contends that she learned of the transfers of the Debtor's assets no earlier than December of 1993. The fraudulent transfer action was filed in the Circuit Court for Pinellas County on November 17, 1994. Barbara Stewart asserts, therefore, that the action was commenced within the limitations period provided by § 726.110(1) because it was filed within one year of the time that she could reasonably have known of the transfers. (Trial Memorandum of Barbara Stewart, Doc. 108, pp. 7–8).

Barbara Stewart testified that she was not aware of the transfers between the Schwab accounts prior to December of 1993. Barbara Stewart further testified that she became aware of the transfers during court proceedings in December of 1993 or January of 1994, and that she had no access to the Debtor's financial records prior to that time. (Transcript, p. 204).

Geneva Forrester, Barbara Stewart's attorney, testified that she learned of the transfers between January or February of 1994, and July of 1994. Specifically, Ms. Forrester testified:

Q: In fact, did not Judge Rondolino enter an order on December 20th [1993] that required Dr. Stewart to produce copies of his January 1989 Schwab bank account?

A: Yes.

Q: And Dr. Stewart did not produce the copy of his January 1989 Schwab bank account voluntarily. You had to go back on January 4 [1994] and file a motion for contempt, did you not?

A: Yes.

. . . . .

Q: Now. You went to trial in July of 1994 and you had the information by then.

A: Right.

Q: So we know that it came in sometime between February to July of 1994, is that correct?

A: Right. And it came from Schwab.

(Transcript, pp. 101–02). Geneva Forrester supported her testimony with references to the docket of the divorce action between the Debtor and Barbara Stewart that was pending in state court. (Barbara Stewart's Exhibit 8). The docket reflects that Barbara Stewart, through her attorney, commenced her efforts to obtain discovery from the Debtor and from Cheryl Stewart in December of 1992, that the Debtor and Cheryl Stewart resisted the discovery efforts, and that Barbara Stewart continued to request the Debtor's financial information until January of 1994. (Transcript, pp. 150–58).

The Court concludes that neither Barbara Stewart nor her counsel knew or could reasonably have known of the transfers from the Debtor's Schwab accounts to Cheryl Stewart's Schwab accounts prior to January of 1994. It is true that Barbara Stewart may have suspected prior to January of 1994 that assets of the Debtor were "missing" (Transcript, pp. 139–45), and it is also true that she may have known prior to January of 1994 that the Debtor had transferred assets other than the securities held in his Schwab accounts (Transcript, pp. 148–49). No evidence exists in the record, however, to show that that Barbara Stewart had knowledge prior to January of 1994, or could reasonably have discovered prior to January of 1994, that securities had been transferred from the

Debtor's Schwab accounts to Cheryl Stewart's Schwab accounts.

Barbara Stewart discovered or reasonably could have discovered the transfers from the Debtor's Schwab accounts no earlier that January of 1994. The fraudulent transfer action was filed in the Circuit Court for Pinellas County on November 17, 1994. The action was filed within the one-year limitations period set forth in § 726.110(1) of the Florida Statutes.

**D. The transfers.**

As indicated above, the focus of this proceeding rests on transfers allegedly made from certain Schwab accounts owned by the Debtor or by the Debtor and Cheryl Stewart as tenants by the entireties, to certain other Schwab accounts owned by Cheryl Stewart individually. The alleged transfers occurred in 1988 and 1989.

To establish the transfers, Barbara Stewart relied primarily on copies of the Schwab account statements for February of 1988 and January and February of 1989, together with the testimony of an accountant, Brian Dickhouse.

In 1988, the Debtor and Cheryl Stewart owned Schwab account number 8506–3332 as tenants by the entireties. (Barbara Stewart's Exhibit 7). The account statement dated February 1 through February 29, 1988, reflects a series of transactions designated as "Journaled Shares" entered for February 29, 1988.

Also in 1988, Cheryl Stewart, individually, owned Schwab account number 8500–9303. (Barbara Stewart's Exhibit 6). The account statement dated January 1 through February 29, 1988, for this account also reflects a series of transactions designated as "Journaled Shares" entered for February 29, 1988.

Brian Dickhouse testified that the term "journaled shares" means that the shares of stock in a "particular account within Charles Schwab are transferred or journaled over to another Charles Schwab account." (Transcript, p. 187). Mr. Dickhouse further testified that he had compared the journaled shares reflected on the entireties account with the journaled shares reflected on Cheryl Stewart's individual account in February of 1988, and determined that the sum of $827,088.63 was transferred from the entireties account to Cheryl Stewart's individual account. (Transcript, p. 188). Mr. Dickhouse also testified that margin debt in the amount of $275,717.28 was transferred at the same time, and that such transfer constituted an offset to the equity of the account. (Transcript, p. 188; Barbara Stewart's Exhibit 12).

In January of 1989, the Debtor owned Schwab account number 8506–3324. (Barbara Stewart's Exhibit 5). The account statement dated January 1 through January 31, 1989, reflects a series of "journaled shares" entered for January 4, 1989.

The account statement for Cheryl Stewart's Schwab account, account number 8500–9303, dated February 1 through February 28, 1989, reflects a series of "journaled shares" entered for February 3, 1989. (Barbara Stewart's Exhibit 6).

Brian Dickhouse testified that he had "compared the journaled shares from one account to the journaled shares of the other account and noted which shares and the value of those shares were transferred between the two accounts." (Transcript. p. 187). Mr. Dickhouse further testified that the fair market value of the investments that were transferred from the Debtor's account to Cheryl Stewart's account was $1,268,129.75 as of January 31, 1989. (Transcript, p. 188).

According to Mr. Dickhouse, therefore, the net value of assets transferred from

the Debtor and Cheryl Stewart as tenants by the entireties in February of 1988 was $551,371.35, and the value of the assets transferred from the Debtor to Cheryl Stewart in January and February of 1989 was $1,268,129.75. Mr. Dickhouse concluded that the "total investments transferred to Cheryl Stewart" in 1988 and 1989 equaled $1,819,501.10. (Barbara Stewart's Exhibit 12).

Although the Debtor was not present at the final hearing in this case, he apparently has acknowledged the transfers in prior proceedings conducted in the state court action. In a nonjury trial in the divorce action on July 20, 1994, for example, the Debtor conceded that he had transferred $1,500,000, plus an additional $800,000, to Cheryl Stewart in late 1988. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, p. 230). The Debtor also acknowledged the transfers in a deposition conducted in connection with this adversary proceeding. (Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, p. 29).

Barbara Stewart has established that the Debtor transferred assets with a net value of $551,371.35 to Cheryl Stewart in February of 1988, and that he transferred additional assets with a value of $1,268,129.75 to Cheryl Stewart in January and February of 1989.

### E. Actual fraud—the statute.

■ In accordance with its terms, the limitations period set forth in § 726.110(1), which governs this case, applies only to causes of action under § 726.105(1)(a). Section 726.105(1)(a) provides that a transfer is fraudulent if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." The one-year limitations period provided by § 726.110(1) does not apply to transfers that are constructively fraudulent as described in § 726.105(1)(b). Consistent with the statute, Barbara Stewart presented evidence and argument only to support her cause of action under § 726.105(1)(a). (See Trial Memorandum by Barbara Stewart, Doc. 108). Consequently, the cause of action in Adversary Proceeding 96–850 will be evaluated only to determine whether the Debtor made the transfers alleged by Barbara Stewart with the actual intent to defraud any creditor.

Subsection 726.105(2) sets forth a list of factors to consider in determining whether a debtor made a transfer with fraudulent intent. That subsection provides:

**726.105. Transfers fraudulent as to present and future creditors**

. . . . .

■ (2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

It is clear from the language of the statute, of course, that the list of "badges of fraud" is nonexclusive, and that courts may consider factors other than those listed in determining a debtor's intent. Generally, courts look to the circumstances surrounding a particular conveyance, and "avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor." *General Trading Incorporated v. Yale Materials Handling Corporation*, 119 F.3d 1485, 1498–99 (11th Cir.1997).

Barbara Stewart contends that the Debtor engaged in a pattern of conduct designed to remove all of his assets from her reach. With respect to the specific factors listed in § 726.105(2), Barbara Stewart asserts that the following "badges of fraud" evidence the Debtor's intent to hinder, delay, or defraud her in the collection of the debt owed to her.

1. *The transfer was to an insider.* The transfers of the securities in the Debtor's Schwab accounts in 1988 and 1989 were made to Cheryl Stewart. Cheryl Stewart is the Debtor's wife. Consequently, the transfers were made to an insider of the Debtor. See § 726.102(7) of the Florida Statutes, which defines an "insider" of an individual debtor to include a relative of the debtor.

2. *The transfer was concealed.* The Debtor resisted Barbara Stewart's efforts in state court to obtain discovery regarding the Debtor's financial affairs. Barbara Stewart testified, for example, that the Debtor did not respond to certain document requests, and that the Debtor omitted the Schwab statements for January of 1989 when he ultimately produced other financial documents. (Transcript, p. 210). Further, Geneva Forrester testified that the Debtor did not produce all of the information regarding his Schwab accounts, and that he "blocked out" specific information on account records that were produced. (Transcript, pp. 94, 121, 144). Finally, the docket of the divorce action, Case No. 82–272–CI–8, reflects a series of discovery requests and responses commencing in late 1992 and culminating in an Order entered on December 20, 1993. That Order expressly directed the Debtor to produce the Schwab account statements from July of 1987 until January of 1989, and further directed the Debtor to produce Schwab statements "that are not blocked out." (Barbara Stewart's Exhibits 8, 11).

3. *The Debtor had been sued or threatened with suit.* The transfers at issue occurred in 1988 and 1989. The divorce action of the Debtor and Barbara Stewart was initially commenced in 1982, and remained pending. At the time of the transfers, Barbara Stewart's attorney was actively seeking an award of attorney's fees from the Debtor, even though matters involving Barbara Stewart's underlying request for support were dismissed at the time. (Barbara Stewart's Exhibit 8).

4. *The transfer was of substantially all of the Debtor's assets.* In addition to the securities in the Schwab account, the Debtor also had transferred an office building from himself, individually, to himself and Cheryl Stewart, jointly, in 1986. The same year, he also transferred a home, an automobile, and some mutual funds to himself and Cheryl Stewart as tenants by the entireties. (Barbara Stewart's Exhibit 2,

Deposition testimony of John Stewart, pp. 14, 17, 30).

5. *The Debtor received no consideration for the transfer.* No evidence exists in the record that any consideration was exchanged between the Debtor and Cheryl Stewart at the time that the securities were transferred to her in 1988 and 1989. At the nonjury trial in state court on July 20, 1994, the Debtor was asked to explain his rationale for making the transfers to Cheryl Stewart, and he did not identify any asset of economic value that was received in exchange for the securities. (Barbara Stewart's Exhibit 1A, Transcript of Nonjury Trial, pp. 230–31).

Notwithstanding the factors described by Barbara Stewart, other circumstances are present in this case which weigh against a finding that the Debtor transferred the securities to Cheryl Stewart with the actual intent to hinder, delay, or defraud a creditor.

1. *Retention of control.* Barbara Stewart apparently concedes that no direct evidence shows that the Debtor retained control of the securities after they were transferred to Cheryl Stewart. (Transcript, p. 250). Further, with respect to the transferred securities, the Debtor testified that Cheryl Stewart does all of her own trading, guided primarily by publications that she receives, that the Debtor had not spoken with a Schwab employee in more than ten years, that he does not monitor the stock market, and that he only participates in the management of the funds if Cheryl Stewart asks for his opinion. (Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, pp. 65–67).

2. *Concealment.* From early 1988 until December of 1992, Barbara Stewart did not request any information from the Debtor regarding the transfer of any assets. (See Barbara Stewart's Exhibit 8). According to Barbara Stewart, the Debtor was making current support payments to her during this period, and she therefore had no reason to request any information. (Transcript, pp. 232, 236). The transfers at issue in this case were made in 1988 and 1989, during the time when no discovery requests were pending. Consequently, no evidence was presented to show that the "journaled shares" were actively concealed in the years after they were made.

3. *"Substantially all" of the Debtor's assets.* It appears that a significant asset is being administered in the Debtor's chapter 7 case. The primary asset scheduled by the Debtor at the time that he filed his chapter 7 petition in 1996 was the medical office building located in Pinellas County, Florida, although he claimed the building as exempt pursuant to § 522(b)(2) of the Florida Statutes. During the course of the chapter 7 case, the office building was sold for the purchase price of $450,000. The order authorizing the sale requires that the net proceeds of the sale be held in trust, and prohibits any distribution of the funds without further order of the Court. (Case No. 96–1005–8G7, Doc. 72). Further, the Trustee lists a one-half interest in the medical office building on her interim asset reports in the chapter 7 case. (Case No. 96–1005–8G7, Doc. 168).

4. *The Debtor's subjective reason for the transfer.* William Stewart, the son of Cheryl Stewart and the Debtor, was born on December 11, 1988. William was born prematurely, weighing only two pounds at birth, and the Debtor feared that William might suffer long-term consequences as a result of his premature birth. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, pp. 225–29). Further, the Debtor believed that he was uninsurable at the time of the child's birth because of his own recurrent medical difficulties. The Debtor testified, therefore, that he transferred the securities to Che-

ryl Stewart in 1989 in an effort to ensure that she would be able to care for herself and the child. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, pp. 230–31).

5. *The source of the transferred funds.* The securities transferred to Cheryl Stewart originated from the Debtor's retirement plan. The Debtor testified that the money that was transferred through the Schwab account was money that was in his pension plan. He acknowledged that he gave Cheryl Stewart his pension and profit sharing benefits. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, p. 232; Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, pp. 28–29). (Barbara Stewart, who had been enrolled as an employee of the Debtor's professional association, previously had received her retirement benefits from the plan in the amount of $95,000.)(Transcript, p. 228; Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, p. 234).

6. *Insolvency.* There is no evidence that the Debtor was insolvent at the time of the transfers in January of 1989, or that he became insolvent shortly thereafter.

### F. Actual fraud—application.

■ "The standard to determine whether a transfer is fraudulent under Florida law is the preponderance of the evidence standard." *In re Young,* 235 B.R. 666, 669 (Bankr.M.D.Fla.1999). See also *In re Paul,* 217 B.R. 336, 337 n. 2 (S.D.Fla. 1997)("The correct standard by which to judge whether a transfer is fraudulent under Florida law is the preponderance. of the evidence standard.")

In *Young, supra,* the Court balanced the factors offered both to support and to negate the debtor's actual intent, and concluded that insufficient evidence was presented to show that the debtor acted with the intent to hinder, delay, or defraud creditors. *In re Young,* 235 B.R. at 669–70. See also *In re Mart,* 88 B.R. 436, 438 (Bankr.S.D.Fla.1988)("The facts before me, however, do not support a finding of fraudulent intent."); and *Gass v. Comreal Miami Incorporated,* 653 So.2d 1069, 1070 (Fla. 3d DCA 1995)("Here, insufficient indicia of fraud exist to determine that this was a fraudulent transfer.")

Similarly, in *In re Ostrovsky,* 224 B.R. 832 (Bankr.M.D.Fla.1998), the plaintiff had asserted that the debtor's discharge should be denied pursuant to § 727(a)(2)(A) of the Bankruptcy Code because the debtor had fraudulently transferred property with the intent to hinder, delay, or defraud a creditor. Although *Ostrovsky* arises from a different statutory basis than the case at issue, the Court considered the elements of a fraudulent transfer action, and acknowledged that intent to defraud may be inferred from a debtor's conduct. *In re Ostrovsky,* 224 B.R. at 834. In that case, however, the court viewed the evidence as follows:

> [T]he most that can be concluded is that the evidence presented as it pertains to the Debtor's intent is in equilibrium, that is, the proof presented is equally consistent with the propositions put forth by both the Debtor and the Plaintiff.

*Id.* at 834. The Court determined, therefore, that the plaintiff had not met its burden of proving the fraudulent transfer by a preponderance of the evidence. *Id.*

In this case, it is clear that the transfers from the Debtor's Schwab account to Cheryl Stewart's Schwab account were transfers to an insider.

It is equally clear that the Debtor did not receive any economic consideration from Cheryl Stewart in exchange for the transfers, and that the Debtor had been

involved in extended, although somewhat sporadic, litigation with Barbara Stewart for approximately six years at the time that the transfers were made. (Barbara Stewart's Exhibit 8).

Finally, it is clear that the Debtor opposed Barbara Stewart's efforts to obtain documentation regarding the transfers when she made such discovery requests commencing in 1992. In this regard, it further appears that the extent of the Debtor's opposition resulted in an order by the state court on December 20, 1993, which specifically required the Debtor to produce his Schwab statements from 1987 until January of 1989, and which also specifically directed the Debtor to produce Schwab statements "that are not blocked out." (Barbara Stewart's Exhibit 11).

It is less clear, however, that the Debtor transferred "substantially all" of his assets to Cheryl Stewart, as contended by Barbara Stewart. The transfers that are the subject of this action consist only of the transfers of securities to a Schwab account owned solely by Cheryl Stewart. In asserting that the Debtor transferred "substantially all" of his assets, therefore, Barbara Stewart points to other transfers that were not outright transfers to Cheryl Stewart, individually, but which instead were transfers from the Debtor to the Debtor and Cheryl Stewart as tenants by the entireties.

The Debtor and Cheryl Stewart were married in 1982. The Debtor transferred the office building, an automobile, and a home to himself and Cheryl Stewart as tenants by the entireties in 1986. (Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, pp. 14, 17). Consequently, the Debtor and Cheryl Stewart had been married for four years at the time of the entireties transfers, and have now been married for almost twenty years. Ownership by the entireties, of course, is a common and even prudent form of ownership for married couples. See *Beal Bank, SSB v. Almand and Associates*, 780 So.2d 45 (Fla.2001).

In any event, the transfer of the office building, the vehicle, and the home did not constitute a complete divestiture of the Debtor's interest in the property, even though the transfers may have had the effect of removing the property from the reach of certain creditors. In fact, the Debtor listed his continued interest in the office building and vehicle, among other assets, on his bankruptcy schedules as property held with Cheryl Stewart as tenants by the entireties.

It is also not clear that the Debtor retained any significant control of the funds in Cheryl Stewart's Schwab account after the occurrence of the transfers that are the subject of this action. As indicated above, the Debtor testified that Cheryl Stewart manages the Schwab account and "does all her own trading." The Debtor further testified that his "thinking is not what it used to be. I can't do this stuff and, in fact, I'm afraid to do it." (Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, pp. 65–66).

The Court is satisfied that the Debtor suffers from various medical conditions that have left him at least partially incapacitated. It appears that he has a form of severe arthritis and may have suffered a stroke, among other physical conditions for which he is prescribed medication. (Barbara Stewart's Exhibit 1, Deposition transcript of John Stewart, pp. 5–8). Additionally, it appears that the Debtor is under the care of a psychiatrist, who also prescribes medication for the Debtor, and that the Debtor may have experienced episodes of disorientation. (Barbara Stewart's Exhibit 1, p. 5, 16–17). The Court cannot conclude from the record that the Debtor retained control over the funds in the

Schwab account after they were transferred to Cheryl Stewart.

Further, the Debtor's testimony at the nonjury trial in July of 1994 is compelling. At that trial, the Debtor testified that his son, William Stewart, was born on December 11, 1988. William Stewart was born prematurely and was in the intensive care unit for three and one-half months after his birth. As a medical doctor, the Debtor was particularly aware of the future health risks that are likely to develop among premature babies. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, pp. 225–29).

The transfer of the Schwab funds in January or February of 1989 occurred just two months after William Stewart's birth. The Debtor believed that he was not insurable at the time because of his own recurrent medical concerns, and testified that he transferred the funds to Cheryl Stewart so that she could care for herself and for William. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, pp. 230–31).

▆▆ In considering all of the factors bearing on a debtor's actual intent to defraud creditors, it is appropriate to conduct "a subjective evaluation of the debtor's motive," in addition to the standard "badges of fraud." *In re Jeffrey Bigelow Design Group, Incorporated,* 956 F.2d 479, 484 (4th Cir.1992). Even where traditional "badges of fraud" may be present, actual intent may not necessarily be presumed where a debtor had legitimate or independent reasons or purposes for making the transfer. *Kelly v. Armstrong,* 206 F.3d 794 (8th Cir.2000). See also *In re Hunter,* 229 B.R. 851 (Bankr.M.D.Fla.1999).

In this case, it is reasonable to conclude that the circumstances surrounding William Stewart's birth provided the Debtor with a legitimate and independent reason for transferring the Schwab funds to Cheryl Stewart, apart from the inferences that may be drawn from other factors present in the case.

Finally, it appears undisputed that the securities transferred to Cheryl Stewart originated in the Debtor's retirement plan. The funds that the Debtor transferred to Cheryl Stewart through the Schwab accounts were the Debtor's pension and profit sharing benefits. (Barbara Stewart's Exhibit 1A, Transcript of July 20, 1994, Nonjury trial, p. 232; Barbara Stewart's Exhibit 2, Deposition transcript of John Stewart, pp. 28–29).

Arguably, a transfer of retirement benefits may not be subject to avoidance as a fraudulent transfer, provided that the pension plan was "tax-qualified" and therefore exempt from execution by creditors. *In re Goldberg,* 229 B.R. 877, 882 (Bankr. S.D.Fla.1998)("The Debtor, as a matter of law, could not have formulated the fraudulent intent necessary to commit a fraudulent transfer if the source of the transfer is an exempt asset absent a commingling of the funds with nonexempt assets."); *In re Fornabaio,* 187 B.R. 780, 782–83 (Bankr. S.D.Fla.1995)(Where creditors would not be able to reach the debtor's property under Florida law, the Court would not penalize the debtor for taking an otherwise legal action by transferring the property.)

In this case, Barbara Stewart testified that she believed the plan was tax-qualified. (Transcript, p. 233). As indicated above, Barbara Stewart was also a participant in the plan, and had received her distribution in the amount of $95,000 in 1986. (Transcript, p. 228). No other direct evidence of the tax-qualified status of the plan was offered into evidence.

In view of the source of the securities in the Schwab account as retirement funds, it is reasonable to conclude that the Debtor believed that he was entitled to transfer

the funds for the support of his family, particularly where a specific need for the support had materialized due to his son's potential health issues.

Considering all of the circumstances surrounding the transfer of the funds in the Schwab accounts, the Court finds that the evidence regarding the Debtor's actual intent to hinder, delay, or defraud creditors is in equilibrium. Viewing the evidence in its entirety, "the proof presented is equally consistent with the propositions put forth by both" Barbara Stewart and Cheryl Stewart. *In re Ostrovsky*, 224 B.R. at 834. In other words, although several statutory "badges of fraud" are present in this case from which an intent to defraud initially may be inferred, it appears equally likely that the Debtor transferred the securities for independent and legitimate purposes and with no intent to defraud creditors. Accordingly, Barbara Stewart did not satisfy the burden of proving that the Debtor made the transfers with the "actual intent" to defraud any creditor by the requisite preponderance of the evidence. A final judgment should be entered against the Trustee and Barbara Stewart, and in favor of Cheryl Stewart.

### G. Effect of the Debtor's default.

As set forth above, the Court determined at the final hearing in this proceeding that a default should be entered against the Debtor, John J. Stewart, Jr. based upon his failure to file a written answer to the Amended Verified Complaint, as directed by the Court, and also based on his failure to appear at the final hearing. (Transcript, pp. 87–88). The Court must next determine, therefore, whether a default judgment should be entered against the Debtor.

"The entry of a default does not automatically entitle the plaintiff to the entry of a default judgment." *Days Inns*

*Acquisition Corporation v. Hutchinson*, 707 So.2d 747, 749 (Fla. 4th DCA 1997).

In Florida, courts have adopted the following general principles regarding the effect of a default:

> A default admits liability as claimed in the pleading by the party seeking affirmative relief against the party in default. It operates as an admission of the truth of the well pleaded allegations of the pleading, *except those concerning damages. It does not admit facts not pleaded, not properly pleaded or conclusions of law.* Fair inferences will be made from the pleadings, but forced inferences will not. The party seeking affirmative relief may not be granted relief that is not supported by the pleadings or by substantive law applicable to the pleadings. A party in default may rely on these limitations.

*Myers v. Myers*, 652 So.2d 1214, 1216 (Fla. 5th DCA 1995)(quoting H. Trawick, Trawick's Florida Practice and Procedure § 25–4 (1994 ed.)) (emphasis supplied in quotation). See also *Ginsberg and MLG Properties, Inc. v. Lennar Florida Holdings, Inc. et al.*, 645 So.2d 490, 493–94 (Fla. 3d DCA 1994); *Becerra v. Equity Imports, Inc.*, 551 So.2d 486, 488 (Fla. 3d DCA 1989). "[I]t is well established a default judgment for damages cannot be affirmed where the underlying complaint does not contain sufficient allegations to sustain the claim of damage." *Ellish v. Richard*, 622 So.2d 1154, 1155 (Fla. 4th DCA 1993).

"On entry of default, the defaulting party admits only the well-pleaded factual allegations of the complaint against it.... The defaulting party does not admit conclusions of law." *Days Inns Acquisition Corporation*, 707 So.2d at 749.

The Court has applied these principles to the Amended Verified Complaint for Fraudulent Conveyance in this case,

and finds that the entry of a default judgment against the Debtor is not appropriate.

The Amended Verified Complaint contains virtually no allegations of fact. It is important to consider the Complaint in its entirety.

The first three paragraphs identify the parties. In the fourth paragraph, Barbara Stewart alleged that she had been damaged by the fraudulent conveyance of assets from the Debtor to Cheryl Stewart, and in the fifth paragraph, Barbara Stewart alleged that the Debtor made the transfers to Cheryl Stewart with the intent to hinder, delay, and defraud her. In paragraphs 6 and 7, Barbara Stewart alleged that the Debtor did not receive reasonably equivalent value in exchange for the transfer, and that he intended to incur debts beyond his ability to pay. In paragraph 8, Barbara Stewart alleged that Cheryl Stewart was an insider.

In paragraphs 9 through 13, Barbara Stewart alleged that the Debtor retained control of the property after the transfers, that the transfers were concealed, that the Debtor had been sued or threatened with suit, that substantially all of the Debtors assets were transferred, and that the transfers "resulted in absconding, removal and concealment of assets." In paragraph 14, Barbara Stewart alleged that the Debtor had terminated his employment, and in paragraph 15 Barbara Stewart alleged that her claim arose before the transfers were made and that she had reason to believe that the Debtor was making himself insolvent by virtue of the transfers.

In paragraph 16, Barbara Stewart alleged that the debt owed to her was reasonably equivalent to the value of the assets transferred. In paragraphs 17 and 18, which are duplicates of each other, Barbara Stewart again alleged that the Debtor had terminated his employment, and that

he was representing himself as insolvent. In paragraph 19, Barbara Stewart alleged that the Debtor testified that he was unable to pay his debts, but that Cheryl Stewart paid the debts when the Debtor was threatened with incarceration.

In paragraph 20, Barbara Stewart alleged:

> During litigation with the Plaintiff, and at all times knowing his obligations to the Plaintiff, Defendant, JOHN J. STEWART, JR., transferred his retirement, proceed [sic] from the sale of his former marital abode, to the sole name of the Defendant, CHERYL STEWART. The amount of these assets is approximately Five Million ($5,000,-000.00) Dollars. The remaining assets were placed in joint names with Defendant, CHERYL STEWART. The Defendant, JOHN J. STEWART, JR., stated these transfers were made for "love" or gave no reason to justify the transfers.

In paragraphs 21 and 22, Barbara Stewart requested an award of attorney's fees and costs and demanded a jury trial.

No additional allegations are included in the Complaint.

It is clear that the Amended Verified Complaint consists of little more than a recitation of § 726.105 of the Florida Statutes. The initial paragraphs simply track the language of the statute regarding the operating elements of actual and constructive fraud, and the following paragraphs only recite general "badges of fraud" as they appear in § 726.105(2) of the Florida Statutes. The only paragraph that purports to include any allegations of fact at all is paragraph 20, and the "facts" set forth in that paragraph constitute only nonspecific references to assets and approximate values. Nowhere in the Complaint does Barbara Stewart allege that an

identifiable asset was transferred on a specific date pursuant to a specific transfer. Further, nowhere in the Complaint does Barbara Stewart allege any specific facts which, even if admitted, would support a finding that a transfer was made with the actual intent to defraud a creditor.

The allegations contained in the Complaint do not require a determination that the Debtor engaged in the fraudulent transfer of assets, and Barbara Stewart therefore is not entitled to affirmative relief upon the entry of a default against the Debtor. *Myers v. Myers,* 652 So.2d at 1216. See also *Ellish v. Richard,* 622 So.2d at 1155. Notwithstanding the entry of a default against the Debtor based upon his failure to answer and appear, therefore, no default final judgment should be entered against the Debtor in this case.

Accordingly:

**IT IS ORDERED** that:

1. As to Adversary Number 96–900, a Final Judgment should be entered against the Plaintiff, Susan K. Woodard, as Trustee, and in favor of the Defendants, John J. Stewart, Jr., individually, Cheryl Ann Stewart, individually, and John J. Stewart, Jr. and Cheryl Ann Stewart, as parents and natural guardians of William Stewart, a minor.

2. As to Adversary Number 96–850:

A. A Default should be entered against the Debtor, John J. Stewart, Jr., and in favor of the Plaintiffs, Susan Woodard, As Trustee, and Barbara Stewart, based upon the Debtor's failure to answer or appear in this proceeding. The Plaintiffs are not entitled to affirmative relief, however, and no default final judgment shall be entered against the Debtor, John J. Stewart, Jr.

B. A Final Judgment should be entered in favor of the Defendant, Cheryl Stewart, and against the Plaintiffs, Susan Woodard, as Trustee, and Barbara Stewart.

3. A separate Final Judgment shall be entered consistent with this Opinion.

## ORDER ON MOTION FOR RECONSIDERATION OF FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

**THIS CASE** came before the Court for hearing to consider the Motion for Reconsideration filed by Susan K. Woodard, Chapter 7 Trustee, on October 9, 2001 on the Findings of Fact, Conclusions of Law and Memorandum Opinion entered on October 1, 2001 in the above-styled adversary proceedings.

### Background

The Debtor in this case, John J. Stewart, Jr., filed a petition under Chapter 7 on January 26, 1996. Barbara Stewart had filed an action against the Debtor in 1994 in Pinellas County, Florida, alleging fraudulent transfers to Cheryl Stewart, the Debtor's current wife. This state court action was removed to the Bankruptcy Court, and assigned Adversary Number 96–850. The Chapter 7 Trustee, Susan K. Woodard, filed a complaint for turnover, to recover fraudulent transfers, and to revoke the Debtor's discharge. This action was assigned Adversary Number 96–900. The two actions were consolidated for purposes of trial.

On October 1, 2001, the Court entered its Findings of Fact, Conclusions of Law and Memorandum Opinion in Adversary Proceeding No. 96–850 and Adversary Proceeding No. 96–900. The Court determined that a final judgment should be entered against the Plaintiff, Susan K. Woodard, as Trustee, and in favor of the Defendants, John J. Stewart, Jr. and Cheryl Ann Stewart, individually, and John J. Stewart, Jr. and Cheryl Ann Stewart, as parents and natural guardians of William

Stewart, a minor, in Adversary Proceeding No. 96–900. In addition, the Court determined that a final judgment should be entered against the Plaintiffs, Barbara Stewart and Susan K. Woodard, as Trustee, and in favor of the Defendant, Cheryl Stewart, in Adversary Proceeding No. 96–850. On October 9, 2001, Susan K. Woodard, as Chapter 7 Trustee, filed a Motion for Reconsideration.

## Discussion

 A motion for reconsideration should be reviewed by the Court in the same manner as a motion for rehearing. In *In re Envirocon International Corporation*, 218 B.R. 978, 979 (M.D.Fla.1998), Judge Kovachevich stated that such motions should "...demonstrate why the court should reexamine its prior decision, and 'set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" (citing *Cover v. Wal–Mart Stores, Inc.*, 148 F.R.D. 294 (M.D.Fla.1993)). The Motion for Reconsideration filed by the Chapter 7 Trustee states that it is predicated on certain mistakes made by the Court in fact and law as follows:

 a. The Trustee did not meet her burden of proof based upon the testimony elicited from the Trustee's expert that the funds could have been received from other sources.

 b. The assets purportedly transferred were exempt.

 c. The Trustee did not meet her burden with respect to Section 727(d).

(Motion for Reconsideration, Paragraph 4.)

 A motion for reconsideration should be based on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear and manifest injustice. *In re Envirocon International Corporation*, 218 B.R. 978, 979 (M.D.Fla.1998), citing *Kern–Tulare Water District v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986). The Chapter 7 Trustee's motion for reconsideration is based on the need to correct clear and manifest injustice. The Trustee does not contend that there is an intervening change in controlling law or that new evidence is available.

The first ground set forth in the Trustee's Motion for Reconsideration concerns the burden of proof to be met by the Trustee in a fraudulent transfer action. The Trustee argues, in essence, that the finding by the Court that "[t]he Trustee has not established the existence of any transfer of the Debtor's interest in property as required by § 548 of the Bankruptcy Code or § 726.105 of the Florida Statutes" is erroneous. (Findings of Fact, Conclusions of Law, and Memorandum Opinion, page 275.)

 A trustee in bankruptcy can avoid a transfer that is fraudulent as defined by § 548(a) or by state law as applied through § 544(b)(1). The application of these provisions to the action brought by the Trustee against Cheryl Stewart first requires the "transfer of an interest of the debtor in property."[1] Thus, the reach of this avoidance power is limited to "transfers" of "property of the debtor." *Jenkins v. Chase Home Mortgage Corporation (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir.1996), citing *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

 The trustee has the burden of proving each element of a fraudulent

---

1. 11 USC § 548(a)(1) provides, "The trustee may avoid any transfer of an interest of the debtor in property..." and 11 USC § 544(b) provides, "...the trustee may avoid any transfer of an interest of the debtor in property..."

transfer. *In re CJW Limited, Inc.*, 172 B.R. 675, 679 (Bankr.M.D.Fla.1994). In adversary proceeding 96–900, the Trustee established that at least $392,691.56 was deposited in individual accounts of Cheryl Stewart during a four year period. This amount was net of any dividends reinvested or interest earned from the accounts, and it was also net of $60,550.00 in wage and rental income for the four years as shown by the individual tax returns of Cheryl Stewart. The Trustee did not establish that any specific deposits were made from funds, accounts, or the liquidation of assets belonging to the Debtor. The Trustee required the Court to infer that a transfer of $392,691.56 of funds of the Debtor was effectuated from the Debtor to his wife, and that such inference was sufficient to satisfy the element of a fraudulent conveyance action of a "transfer of an interest of the debtor in property." However, the Court was not persuaded at the time of the hearing that the Trustee had met her burden of proof on this element, and is not persuaded by the argument set forth in the Motion for Reconsideration.

Counsel for Cheryl Stewart asked the Trustee's expert witness this final question on cross-examination:

Q. And did you examine any document, paper or thing that would lead you to believe that during those years you talked about Cheryl Stewart's account, '92 through '95, that she received money from John Stewart?

A. No.

(Transcript of May 22, 2001, Final Evidentiary Hearing, p. 83.)

In the Motion for Reconsideration, the trustee points to the testimony of Cheryl Stewart at her Continuation Deposition of July 8, 1996, page 40, lines 12–18. The actual testimony (beginning at line 6) is as follows:

Q. . . . But what I'm talking about is Dr. Stewart writing you a check or making a withdrawal to place in your individual accounts; has that ever occurred?

A. Not that I'm aware of. Not that I recall.

Q. Okay. So all the money that you've amassed into your individual accounts, you've solely earned either working for Dr. Stewart or working for someone prior to Dr. Stewart?

A. Through investments, savings.

Q. And investments?

A. And interest, dividends, stock splits.

Q. Okay, But, typically, the money in your investment accounts were not gifts from Dr. Stewart?

A. I have received several gifts from him over the years that we've been married.

Q. Were they monetary gifts?

A. He's—he's given me jewelry.

Q. Monetary.

A. He's given me pianos. He's given me stocks.

Q. Let me stop you right there then. What kind of stocks has he given you?

A. You mean the name of the stocks?

Q. Yes.

A. Oh, this was back in '87, '88. I can't recall without going through everything.

(Transcript of Continuation Deposition of Cheryl A. Stewart, July 8, 1996, page 40, line 6 through page 41, line 9.)

It does not appear that this testimony supports the Trustee's contention that Cheryl Stewart "affirmatively testified under oath with counsel present that she received all her sources of money from her earnings." (Motion for Reconsideration, Paragraph 6). If, in fact, the Court is to infer that the only possible source of the "foreign source" deposits in Cheryl Stew-

art's individual accounts was from property of the Debtor, without tying specific transfers by the Debtor to the deposits, then all other potential sources must have been eliminated.

However, all other sources were not eliminated. For example, the Debtor and his wife held several accounts as tenants by the entireties at the time of the filing of his petition. (See Docket # 25, Second Amended Schedule C—Property Claimed as Exempt and Docket # 160, Order Granting Debtor's Motion for Summary Judgment and Overruling Barbara Stewart's Objection to Debtor's Exemptions and Trustee's Amended Objection to Exemptions.) If transfers had been made in previous years from any asset owned by the Debtor and Cheryl Stewart as tenants by the entireties to Cheryl Stewart's individual accounts, such transfers would not constitute transfers of an "interest of the debtor in property" under Florida law that could be avoided by the fraudulent transfer provisions available to the Trustee. In *In re Peeples,* 105 B.R. 90, 95 (Bankr. M.D.Fla.1989), Judge Proctor determined that assets held as tenants by the entirety would not constitute an "interest of the debtor in property" for purposes of § 548. "Because under Florida law a spouse does not have an individual, identifiable, divisible interest in entireties property, the Trustee cannot prevail ... [in a fraudulent conveyance action]." *Id.*

The Trustee did not rely on evidence of specific transfers from property of the Debtor to Cheryl Stewart, but instead relied on the inference that "foreign source" funds could have come only from a transfer by the Debtor. The Trustee is requiring the Court to determine that $392,691.56 in "foreign source" funds was a transfer or transfers from the individual funds of the Debtor, without presenting evidence of any specific "transfer of an interest of the debtor in property." However, since there are other potential, credible sources that would not be an "interest of the debtor in property" under § 548 or 544(b) that may have constituted the "foreign source" funds in Cheryl Stewart's individual accounts, the Trustee did not meet her burden of proof with regard to this first element of a fraudulent conveyance action.

The second ground for the Motion for Reconsideration is that "...despite the ruling the assets maintained by the Defendant were in all likelihood exempt assets. It appears that this ruling applies solely to Adversary Proceeding 96–850..." (Motion for Reconsideration, Paragraph 12.)

It appears that this reference relates to the discussion in the opinion regarding Adversary 96–850, "Section F. Actual fraud—application." In that discussion, the mention of the possibility that the retirement funds transferred to Cheryl Stewart in 1989 were exempt from execution by creditors was part of an evaluation of the Debtor's motive in transferring such funds.

It may also be that the Trustee is referring to a transfer of assets held by the Debtor and his non-filing spouse as tenants by the entireties to his spouse individually. At the hearing on the Motion for Reconsideration, counsel for the Trustee cited a bankruptcy case, *In re Rotunda,* 55 B.R. 386 (W.D.Pa.1985), for an analysis of an avoidance action where the assets transferred could have been claimed as exempt as entireties property by the debtor if he and his wife had not transferred the property to her father five days prior to filing the petition. In the situation of the Debtor and Cheryl Stewart, the evidence did not show any specific sources of the transfers, but required the Court to infer possibilities of where Cheryl Stewart may have received funds that were depos-

ited in her individual accounts. The Trustee argues that in the event an inference is made by the Court that funds held by the Debtor and Cheryl Stewart as tenants by the entireties were transferred into Cheryl Stewart's individual accounts during the four year period, then 11 U.S.C. § 522(g) may be applicable to the proceeding.

The trustee cites 11 U.S.C. § 522(g) for the statement that "... the Debtor can only reassert his exemptions to the extent he has not voluntarily transferred the same." Section 522(g) provides that:

> (g) Notwithstanding section 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—
>
> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
>
> (B) the debtor did not conceal such property; or
>
> (2) the debtor could have avoided such transfer under subsection (f)(2) of this section.

Under § 522(g) the trustee may recover property under § 550, which incorporates the fraudulent transfer provisions of § 548. (See 11 U.S.C. § 550(a).[2]) Section 522(g) assumes that the trustee actually recovers property. *In re Duncan,* 271 B.R. 196, 199 (10th Cir. BAP 2002); *In re Glass,* 60 F.3d 565, 568 (9th Cir.1995).

In this proceeding, there was no possibility of recovery of entireties property by the Trustee. A succinct discussion of Florida law with regard to recovery of exempt property on fraudulent transfer grounds is contained in *In re Lankry,* 263 B.R. 638, 644 (Bankr.M.D.Fla.2001):

> It is well established under Florida law that exempt property may not be recovered by a trustee on fraudulent transfer grounds because such property could not have been attached by creditors before any transfer. *See Sneed v. Davis,* 135 Fla. 271, 184 So. 865 (1938). The Florida fraudulent transfer act specifically excludes from treatment as a recoverable "asset" property held as a tenancy by the entireties to the extent that such property is subject to process by a creditor holding a claim against only one spouse. *See* Fla.Stat. § 726.102(2)(c) (2001). Therefore, as between spouses still married, "where the original transfer into entireties status is not fraudulent, a subsequent transfer of exempt entireties property [to one spouse] is not avoidable." *Dzikowski v. Delson (In re Delson),* 247 B.R. 873, 876 (Bankr. S.D.Fla.2000) (emphasis original).

In this proceeding, there has been no recovery of property by the Trustee, and no possibility of recovery of entireties property by the Trustee. Section 522(g) of the Bankruptcy Code is inapplicable to this proceeding.

In Count VIII of her Amended Complaint filed in Adversary 96–900, the Trustee alleged that the Debtor's discharge should be revoked pursuant to § 727(d) of the Bankruptcy Code, on the grounds that

---

**2.** 11 USC § 550. Liability of transferee of avoided transfer

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b) or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

the Debtor failed to disclose assets that were "maintained" by him in Cheryl Stewart's accounts. In the Findings of Fact, Conclusions of Law and Memorandum Opinion entered on October 1, 2001, the Court determined that the Trustee had not established that the Debtor's discharge should be revoked.

■ In her Motion for Reconsideration, the Trustee alleged that the Debtor purposely failed to attend the final evidentiary hearing, and requests that the Court revoke the Debtor's discharge based on §§ 727(d)(3) and 727(a)(6)(c). 11 U.S.C. § 727(d)(3) provides:

> (d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—
>
> (3) the debtor committed an act specified in subsection (a)(6) of this section.

11 U.S.C. § 727(a)(6)(C) provides:

> (a) The court shall grant the debtor a discharge, unless—
>
> (6) the debtor has refused, in the case—
>
> (C) on the ground other than the properly invoked privilege against self-incrimination to respond to a material question approved by the court or to testify;

In the case of *In re Poland*, 222 B.R. 374 (Bankr.M.D.Fla.1998), Judge Funk analyzed the duty of a debtor to testify in a hearing on an objection to discharge as required by Federal Rule of Bankruptcy Procedure 4002(2). Citing *MacPherson v. Shaheen (In re MacPherson )*, 129 B.R. 259, 261 (M.D.Fla.1991), Judge Funk stated:

> This Court wholeheartedly agrees that the current Code and Rules do not contain a mandatory denial of discharge if the debtor fails to appear at a trial objecting to the discharge. This Court further agrees that the failure to appear and testify at a hearing objecting to discharge could result in a default judgment; however, this Court does not believe that the circumstances in this Proceeding warrant such a draconian measure. A default is clearly within the Court's discretion. Fed.R.Bankr.P. 7055 (1998). Federal Rule of Bankruptcy Procedure 4005 clearly places the initial burden of persuasion in an objection to discharge on the Plaintiff. Fed.R.Bankr.P. 4005 (1998)... In this proceeding, Plaintiff still had the burden to go forward and to prove the evidentiary basis for a default judgment; the entry of a default judgment would not be automatic. Therefore, although the Court finds that Defendant's election not to attend, regardless of motive, violated Rule 4002(2), the Court does not find that his failure to do so would result in a default judgment [*footnote omitted* ] as the Plaintiff still had the burden of going forward under Rule 4005.

*In re Poland,* 222 B.R. at 377.

This Court agrees with *In re Poland,* supra, and the fact that the Debtor did not attend the trial does not require the Court to revoke his discharge.

### Conclusion

For the reasons expressed above, the motion for reconsideration should be denied.

Accordingly:

**IT IS ORDERED** that the Motion for Reconsideration of Findings of Fact, Conclusions of Law, and Memorandum Opinion which was filed by Susan K. Woodard, Chapter 7 Trustee, is denied.