In re Bruce Lee JENNINGS, Debtor.

No. 03–04926–3F7.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Sept. 22, 2005.

Ned R. Nashban, Quarles & Brady LLP, Boca Raton, FL, for debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case came before the Court upon the objection of Brandon James Maxfield (AMaxfield@) to Bruce Lee Jennings' claim of exemption for a $500,000 annuity purchased through Allianz Insurance Company. The Court conducted hearings on the matter on April 8 and April 9, 2004. In lieu of oral argument, the Court directed the parties to submit legal memoranda in support of their respective positions. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Bruce Lee Jennings ("Jennings") is the sole shareholder of B.L. Jennings, Inc. ("B.L.Jennings"), a firearms distributor. (Tr. at 129.) Although he was not technically an officer of Bryco Arms ("Bryco"), a handgun manufacturer, Jennings was involved in its day-to-day operations and served as a consultant to the company since its inception. (Tr. at 130.) Bryco Arms sells its handguns mainly to B.L. Jennings. (Id.)

On April 6, 1994 Maxfield was injured in an accidental shooting involving a handgun designed by Jennings, manufactured by Bryco, and distributed by B.L. Jennings. The accident occurred approximately five days after Bryco's insurance lapsed. (Tr. at 131.) Neither Jennings nor B.L. Jennings carried insurance. (Id.)

In approximately May, 2001 Maxfield commenced an action in California Superior Court ("the California litigation") seeking damages against: 1) Bryco, 2) B.L. Jennings, 3) Larry William Morford, II, the shooter of the gun, 4) Willits Pawn, and 5) Does 1 to 100. (Maxfield's Ex. 11.)

On October 4, 2001 Richard Ruggieri ("Ruggieri"), Maxfield's attorney in the California litigation, sent a letter (the "settlement letter") to Mike Hewitt ("Hewitt"), the attorney for Bryco and B.L. Jennings in the California litigation. (Maxfield's Ex. 15.) The settlement letter described Ruggieri's opinion of the facts and law and attempted to solicit a settlement offer. (Id.) The settlement letter provided in pertinent part:

> With future medical specials and earnings loss, Plaintiff's projected total special ("economic") damages will exceed $10 million. Plaintiff's general ("non-economic") damages bring total damages to over $40 million, in round numbers.... If I convince even 9 of the 12 jurors, to be even 51% sure ("preponderance of the evidence") that your clients' product contributed even 1% to the accident, then your client has to pay plaintiff the full $10 million that represents "economic" damages ... For each additional percentage point that 1 convince the jury that your client's [sic] product contributed to the accident, your clients have to pay 1% of plaintiff's general or "non-economic" damages, over and above the $10 million "economic" damages, and again without any chance to obtain reimbursement or contribution from anyone else.

On or before October 18, 2001 Maxfield added Jennings as a defendant in the California litigation alleging that Jennings defectively designed the handgun, which injured Maxfield. (Maxfield's Ex. 13; Tr. at 32–33.) The California litigation was "by far and away the largest lawsuit in terms of damages potential that [Jennings, Bryco, or B.L. Jennings] had ever faced." (Tr. at 39.) On November 5, 2001 Maxfield made an offer to compromise to Jennings for $7.5 million. (Maxfield's Ex. 16.) On December 21, 2001 Maxfield made an offer to compromise to Janice Kay Jennings, RKB Investments, and Janice K. Jennings as Trustee for the following Trusts: the Rhonda D. Jennings California Trust, the Kimberly K. Jennings California Trust, the Bradley A. Jennings California Trust, the Rhonda D. Jennings Nevada Trust, the Kimberly K. Jennings Nevada Trust, and the Bradley A. Jennings Nevada Trust[1] (collectively "the Alter Ego Parties"). (Maxfield's Ex. 17.) Maxfield sought $7.5 million from each of the Alter Ego Parties. (*Id.*) The amended complaint which added the Alter Ego Parties was served on January 30, 2002.[2]

Ruggieri testified that he justified such demands because "the thing about this case which made it unusual in this sense

was that under the—without going into a long story, under the California rules of joint and several liability, meshed with the rules of general and special damages, the bottom line was, if any of these Debtors were found to be one percent at fault for my client's accident, they would, at a minimum, be responsible for all of my client's past and future medical expenses, which we were estimating to be at $11–to $12 million." (Tr. at 46.)

. Ruggieri testified that after the offers of compromise were served he had a conversation with Hewitt during which he explained his theory on recovery of economic damages and went over the settlement letter. (Tr. at 46.) Ruggieri testified that "[t]he point I was trying to emphasize to [Hewitt], and did emphasize, was that [Maxfield] only had to prove—[Maxfield] only had to convince nine out of twelve jurors to be fifty-one percent sure that any one of the Debtors was either one percent responsible for the accident and the judgment would be at least $11 million. So that was—that's the way these cases shake down." (Tr. at 47.) Ruggieri also testified that the time between November 2001 to February 2002 was "World War III. I was doing extensive discovery on what I call

1. Janice Jennings is Jennings' former wife. In May 1981 Jennings and Janice Jennings established the Kimberly K. Jennings California Trust and the Rhonda D. Jennings California Trust. In February 1983 Jennings and Janice Jennings established the Bradley A. Jennings California Trust. Jennings. is the father of Kimberly K. Jennings, Rhonda D. Jennings, and Bradley A. Jennings, the respective beneficiaries of the California trusts. Janice is the mother of Kimberly K. Jennings and Bradley A. Jennings.

In May 1987 Jennings and Janice Jennings established the Kimberly K. Jennings Nevada Trust, the Bradley A. Jennings Nevada Trust, and the Rhonda D. Jennings Nevada Trust. In approximately 1988 the Kimberly K. Jennings California Trust, the Rhonda D. Jen-

nings California Trust, and the Bradley A. Jennings California Trust created RKB, a partnership.

Rhonda Jennings turned 25 sometime in 1992 or 1993 at which point the Rhonda D. Jennings California Trust ceased being a partner in RKB and Rhonda Jennings received her share of the equity in RKB.

(March 23, 2004 Findings of Fact and Conclusions of Law on Maxfield's Motion to Convert Bruce Jennings' Case from Chapter 11 to Chapter 7.)

2. Maxfield sought to recover from the assets of the Alter Ego Parties any judgment liability obtained against Jennings, Bryco and B.L. Jennings under joint venture/enterprise, partnership, and alter ego theories.

the alter ego claims." During that time Ruggieri sought detailed information concerning the assets of Jennings and his companies and transfers among the various entities. (Tr. at 48–49.)

The court in the California litigation conducted a status conference in November or early December 2001 and set a trial setting conference for February 2002. At the status conference the parties were told that the trial would be conducted in the summer of 2002. (Tr. at 48.)

Jennings met with Ned Nashban, a bankruptcy attorney with the law firm of Quarles & Brady, LLP in Boca Raton, Florida, in late January or early February of 2002. (Maxfield's Exs. 23, 24.) Jennings testified that the purpose of the initial meeting was for estate planning. (Tr. at 134.) On January 29, 2002 Jennings made an offer to purchase a home in Daytona Beach, Florida for $925,000.00. The offer was accepted and the transaction closed on February 15, 2002. (Maxfield's Ex. 29.) Jennings paid cash for the house. Jennings testified that he has always paid cash for houses. (Tr. at 227–229.)

Jennings met or had additional conversations with Nashban in February, 2002. (Maxfield's Ex. 37.) During mid February 2002, Jennings contacted Kurt Knauss, a financial salesperson, to assist him in purchasing an annuity. (Maxfield's Ex. 8 at 22.) Jennings had never previously discussed retirement planning with Knauss and had never before purchased any investment products through him. (*Id.* at 46.) Knauss testified that Jennings told him he wanted to spend $500,000 on an annuity and he wanted it to be issued in Florida. (*Id.* at 24, 34) At that time Jennings, who was 53 years old, did not own an IRA, was not a participant in a retirement plan, and did not have any formal retirement savings. Jennings' only retirement was his personal assets. (Tr. at 252.)

Jennings testified that he opted to purchase an annuity rather than contribute to an IRA or a 401(k) plan because the latter must be funded by a salary. At that time Jennings had not received a salary for five years. Jennings also testified that the $3,000–$4,000 IRA contribution limitation would be insufficient to fund his retirement. (Tr. at 253.)

On March 5, 2002 Jennings purchased a single premium $500,000 annuity from Allianz Insurance Company. (Maxfield's Ex. 41.) If Jennings surrenders the annuity during the first five years after its purchase, he will receive a payout of $446,250. (Maxfield's Exs. 8 at 136–138; 40.) At the time he purchased the annuity, Jennings had $137,112.21 in his Wells Fargo checking account. (Jennings' Ex. 4; Tr. at 260.) The balance in his Bank of America account was $568,530.70. (Jennings' Ex. 7; Tr. at 260.) Accordingly, Jennings had approximately $200,000 in the bank in addition to the $500,000 he used to purchase the annuity. Additionally, Jennings owned several cars, two boats and a yacht with an aggregate value of approximately $1,000,000. (Tr. at 242–250.) Jennings testified that at the time he purchased the annuity, he did not believe Maxfield would obtain a judgment against him individually in the California litigation. (Tr. at 264.)

On May 13, 2003 the court in the California litigation entered a judgment against Jennings in the amount of $21,250,650.31. (Maxfield's Ex. 22.) On May 14, 2003 Jennings, Bryco, B.L. Jennings and the Alter Ego Parties filed voluntary Chapter 11 bankruptcy petitions. All of the debtors were represented by Ned Nashban and Quarles & Brady. Jennings filed his bankruptcy schedules on June 20, 2003. Not taking into account claimed back payroll from B.L. Jennings and claimed loans owed to him by B.L. Jennings, Jennings claimed approximately

$695,000 in non-exempt tangible personal property on Schedule B. On Schedule C Jennings claimed the Allianz Annuity as exempt pursuant to Fla. Stat. § 222.21(2). Maxfield objected to Jennings' claim of exemption, contending that Jennings purchased the annuity with the intent to hinder, delay or defraud creditors.

## CONCLUSIONS OF LAW

■■■ The burden is on a creditor who objects to a debtor's claim of exemption to establish by a preponderance of the evidence that the debtor is not entitled to the exemption claimed. Fed. R. Bankr.P. 4003(c) (2005); See also *In re Ehnle*, 124 B.R. 361, 363 (Bankr.M.D.Fla.1991). Section 222.30 of the Florida Statutes provides that "[a]ny conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, whether the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor." A debtor's claim of exemption for an exemption acquired through a fraudulent asset conversion will be disallowed.

■■■ Section 222.30 adopts the definitional section from Florida Statutes § 726, "unless the application of a definition would be unreasonable". This cross-referencing of the two statutory provisions suggests that they are to be read in tandem. *In re Levine*, 134 F.3d 1046, 1053 (11th Cir.1998). Section 726.105(2) sets forth a number of factors or "badges of fraud" which can be considered in determining whether a debtor made a transfer with the actual intent to hinder, delay or defraud a creditor and provides in pertinent part:

(2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

■■■ The language of the statute makes clear that the badges of fraud are nonexclusive and that courts may consider other factors in determining a debtor's intent. *In re Stewart*, 280 B.R. 268, 279 (Bankr.M.D.Fla.2001). "In addition, courts take into account 'the particular facts surrounding the conveyance,' and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor." *General Trading Inc. v. Yale Materials Handling*

*Corp.*, 119 F.3d 1485, 1498–1499 (11th Cir. 1997) (quoting *Kirk v. Edinger,* 380 So.2d 1336, 1337 (Fla. 5th Dist.Ct.App.1980)).

■ Maxfield argues that: 1) Jennings retained possession or control of the property transferred; 2) Jennings concealed the purchase of the annuity; 3) Jennings purchased the annuity shortly after being served with the Maxfield complaint; 4) the purchase of the annuity depleted essentially all of Jennings' cash assets; 5) Jennings absconded by removing assets to Florida; and 6) Jennings' purchase of the annuity was part of an ongoing course of conduct of concealing assets and limiting his exposure to creditor claims. The Court will address each argument in turn.[3]

### Jennings retained possession or control over the money used to purchase the annuity

Maxfield contends that Jennings retained control of the money transferred because he can redeem the annuity at any time for only a 10% penalty. Jennings cites *In re Levine,* 134 F.3d 1046 (11th Cir.1998) for the proposition that one who purchases an annuity does not retain control or possession of the money used to fund the annuity. The issue before the court in Levine was whether the purchase of an annuity constituted a transfer for purposes of Florida fraudulent transfer law. *Id.* at 1049. The court concluded that because an individual who purchases an annuity "does not retain total control over that asset and does not have unfettered access to the full amount of his own 'property' ", the purchase of an annuity is a transfer for purposes of the Florida fraudulent transfer statute. *Id.* at 1050.

The Court finds Levine inapposite to the issue of whether Jennings retained control of the $500,000. In light of the fact that Jennings may redeem the annuity at any time for only an approximate 10% penalty, the Court finds that Jennings retained control over the money used to fund the annuity.

### The purchase of the annuity was not concealed

Maxfield concedes that Jennings disclosed the purchase of the annuity in his bankruptcy schedules, but alleges that Jennings actively concealed the annuity purchase in the California litigation. The Court finds that the purchase of the annuity was not concealed.

### Jennings was sued by Maxfield before he purchased the annuity

The Court finds this to be the most significant issue in this proceeding. That Jennings was sued by Maxfield before he purchased the annuity is uncontested. However, Jennings argues that he did not believe a judgment would be entered against him individually. In light of the explanation in the settlement letter and Ruggieri's testimony concerning his November or December 2001 conversation with Hewitt, Jennings knew that if he was found to be even one percent at fault for Maxfield's injury, he would be jointly and severally liable for Maxfield's estimated $10,000,000–12,000,000 economic damages.[4] He also knew that if and to the extent that he was found to be at fault for Maxfield's injury, he would be liable for the amount of non-economic damages (whose estimated total was $30,000,000) allocated to him in direct proportion to his percentage of fault.[5] Armed with this knowledge, less

---

3. Because Maxfield does not contend that the remaining "badges of fraud" apply to the purchase of the annuity, the Court finds it unnecessary to discuss them.

4. *See* Cal. Civ.Code § 1431 (2005).

5. *See* Cal. Civ.Code § 1431.2 (2005).

than two months after the Ruggieri–Hewitt conversation Jennings met with Nashban to discuss what Jennings referred to as estate planning. The meeting occurred at a time during which Maxfield sought detailed information concerning Jennings' assets. Additionally, Jennings was under the impression that the trial in the California litigation would be conducted during the summer of 2002. Within five weeks of that meeting. Jennings, who had never set aside any money for retirement, purchased a single premium $500,000 annuity.

While Jennings may have thought it unlikely that a judgment would be entered against him individually, the Court is convinced that Jennings believed the stakes were too high to take any chances. Jennings' purchase of the annuity was an insurance policy of sorts. If a judgment had not been entered against him individually, he would have lost nothing by purchasing the annuity. If a judgment was entered against him individually, he would have at least $500,000 for a new start. The timing of and the chronology of events leading up to Jennings' purchase of the annuity leads to but one conclusion; Jennings purchased the annuity to keep the money beyond the reach of Maxfield.

The purchase of the annuity was not substantially all of Jennings' assets

When Jennings purchased the annuity, he had at least $1,700,000 in non-exempt assets.[6] The balance in his Wells Fargo checking account was $137,112.21. (Jennings' Ex. 4; Tr. at 260.) The balance in his Bank of America account was $568,530.70. (Jennings' Ex. 7; Tr. at 260.) Accordingly, Jennings had approximately $200,000 in the bank in addition to the

$500,000 he used to purchase the annuity. Additionally, Jennings owned several cars, two boats and a yacht with an aggregate value of approximately $1,000,000. The Court finds that the purchase of the annuity was not substantially all of Jennings' assets.

### Jennings did not abscond

Maxfield contends that Jennings absconded by removing assets to Florida. Black's Law Dictionary defines abscond as "to depart secretly or suddenly. To avoid service of process; to conceal oneself." There is no evidence that Jennings absconded.

Jennings did not remove or conceal assets

Maxfield asserts that Jennings' purchase of the annuity was part of an ongoing course of concealing assets and limiting his exposure to creditor claims. Maxfield alleges that Jennings: 1) concealed the existence of Jennings Racing, Inc. by not listing it on his bankruptcy schedules; and 2) withdrew over $259,000 from his Bank of America bank account in the week preceding the bankruptcy filing. The Court finds that these allegations are relevant to the issue of whether Jennings is entitled to a discharge but not to the issue of whether he purchased the annuity over a year earlier with the intent to hinder, delay or defraud Maxfield.

Jennings contends that even where traditional "badges of fraud" may be present, actual intent should not necessarily be presumed when a debtor had legitimate or independent reasons for making the transfer. Jennings points out that he had no formal retirement plan when he purchased the annuity and that the annuity was his only retirement option. As Maxfield

---

6. Jennings contends that at the time he purchased the annuity he was owed $1,419,000 by B.L. Jennings and thus had available assets in excess of $3,000,000. Because the Court finds that the purchase of the annuity was not

substantially all of Jennings' assets even without taking into account whether he was owed money by B.L. Jennings, the Court finds it unnecessary to make a finding or conclusion as to that issue.

points out, however, Jennings made the decision not to draw a salary from B.L. Jennings or to set up a retirement plan through the company. Moreover, Jennings could have purchased an annuity which allowed him to make annual contributions instead of a single premium purchase. The Court finds that Jennings' sudden interest in retirement options was in fact an interest in keeping the $500,000 from Maxfield.

█ Finally, Jennings contends that if he had been advised by Quarles & Brady to convert non-exempt assets to exempt assets, he would have purchased a much larger annuity and would not have been left with almost $700,000 in non-exempt assets when he filed bankruptcy. However, as Maxfield points out § 222.30 does not contain a size limitation on avoiding a fraudulent transfer conversion. Thus, even if Jennings purchased an annuity with the intent to place even a small portion of his assets outside the reach of creditors, the transfer can be avoided.[7]

### CONCLUSION

In light of: 1) the timing of and the chronology of events leading up to the purchase of the annuity; 2) the fact that Jennings retained control over 90% of the money used to purchase the annuity; and 3) the fact that Jennings, who was 53 years old, had never previously set aside any money for retirement, the Court finds that Jennings purchased the annuity with the intent to keep it out of the reach of Maxfield. Accordingly, the purchase of the annuity was a fraudulent asset conversion, and the annuity is not exempt. The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.

### ORDER SUSTAINING BRANDON JAMES MAXFIELD'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION

This case came before the Court upon Brandon James Maxfield's Objection to Debtor's Claim of Exemption for an Allianz Annuity. Upon Findings of Fact and Conclusions of Law separately entered, it is

**ORDERED:**

1. Brandon James Maxfield's Objection to Debtor's Claim of Exemption for the Allianz Annuity is sustained.

2. The Allianz Annuity is not exempt from the claims of creditors and is subject to administration in this case.

----

7. As discussed supra p. ——, whether a transfer is of substantially all of a debtor's assets is a "badge of fraud" the Court may consider in determining whether a debtor made a transfer with the actual intent to hinder, delay, or defraud a creditor. In light of the presence of two other badges of fraud as well as the timing of the purchase of the annuity, the absence of this particular badge does not establish that Jennings lacked fraudulent intent.