**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-10850

————————————————

In Re: ATIF, Inc.,

*Debtor.*

DANIEL J. STERMER,

*Plaintiff-Appellant,*

*versus*

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY,
OLD REPUBLIC NATIONAL TITLE HOLDING COMPANY,
OLD REPUBLIC TITLE COMPANIES, INC.,
ATTORNEYS TITLE FUND SERVICES, LLC,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:21-cv-00950-JLB,
Bkcy No. 2:17-bk-01712-FMD

————————————————

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

Creditor Trustee, Daniel Stermer, appeals the district court's judgment in favor of Defendants Old Republic National Title Insurance Company ("OR Title"), Old Republic National Title Holding Company ("OR Holding"), Old Republic Title Companies, Inc. ("OR Companies") (collectively, the "OR Defendants"), and Attorneys' Title Fund Services, LLC ("ATFS") in a bankruptcy proceeding involving ATIF, Inc. (the "Debtor"). This appeal and the proceedings below concern the transfer of the Debtor's assets within 15 months of filing for bankruptcy. The Creditor Trustee, suing under 11 U.S.C. § 548(a)(1) of the Bankruptcy Code and Chapter 726 of the Florida Statutes, sought to avoid the transfer of those assets. He further sought to have ATFS declared as an alter ego for OR Holding and OR Companies and to hold OR Holding and OR Companies liable as the Debtor's "successor in interest."

The case primarily centers around the validity of a "Master Agreement" between OR Title, the Debtor, and related parties with respect to whether intangible assets were transferred at their reasonable equivalent value. Following a bench trial, the bankruptcy court held that the Debtor transferred those assets at their reasonably equivalent value and, therefore, none of the Debtor's creditors were harmed.

On appeal, the Creditor Trustee challenges the bankruptcy court's exclusion of his expert's opinion which valued the transferred assets at a much higher amount than the bankruptcy court determined, and its rejection of the successor liability and alter ego

claims. After a thorough review of the record and the parties' briefs, and with the benefit of oral argument, we affirm the district court's order.

## I.     BACKGROUND

### A. Joint Venture Agreement

The Debtor is a Florida-based title insurer regulated by the Florida Office of Insurance Regulation ("FL-OIR"). The Debtor provided services such as issuing title insurance policies through licensed attorney-agents, underwriting, training agents, helping with title-related issues, and maintaining a title plant—a compilation of title information and records in Florida to search and examine title to real property. In 2008, the Debtor suffered a massive financial hit due to defalcations[1] by its attorney-agents, a decline in the value of its stock market investments, and the reduction of income from title insurance policies.

To save the Debtor from financially disintegrating, the Debtor and OR Holding entered into a joint venture agreement and formed the limited liability company ATFS in 2009. Each party owned a 50 percent interest in ATFS. OR Holding contributed $10 million in cash to ATFS. The Debtor contributed its workforce, agent network, and title plant, which ATFS maintained. Pursuant to the 2009 joint venture agreement, the Debtor and OR Holding entered into an operating agreement for ATFS. After the

---

[1] Defalcation most commonly refers to a fiduciary's inability to produce entrusted funds or property. *See Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir. 1993).

agreement, the two entities operated from the same location because ATFS leased the Debtor's office space. ATFS performed certain of the Debtor's former functions on behalf of OR Title, although it ceased to issue new title policies. The Debtor continued to administer its existing title policies.

ATFS maintained and updated the title plant by conducting searches of real property records on the title plant for OR Title, which began issuing new title policies in the Debtor's stead. In return, ATFS received a percentage of the revenue from title policies that OR Title issued. Although ATFS maintained the title plant, it delivered a copy of the updated title plant to the Debtor every six months.

After executing the joint venture agreement, the Debtor retained substantially all its assets. The Debtor reported to the FL-OIR that, three months after entering into the joint venture agreement, it retained approximately $240 million in assets. Despite receiving income from the title plant and a percentage of the revenue from OR Title's policy premiums, ATFS experienced operating losses totaling $30 million over 27 months. OR Holding funded ATFS with approximately $20 million in loans to keep it afloat. The Debtor contributed by licensing its trade names and marks, including "The Fund"—the name under which it did business—to ATFS at no cost.

### B. *The Amended Joint Venture Agreement*

In 2011, the Debtor, OR Defendants, and ATFS amended the joint venture agreement to alter the ownership interests of the

Debtor and OR Holding in ATFS.  Under the amended agreement, an independent board of governors—comprising three governors designated by OR Holding, two designated by the Debtor, and the Chief Executive Officer of ATFS—controlled ATFS's business operations.  The agreement also converted the Debtor's financial interest in ATFS to a governance-only interest.  It provided the Debtor the option of converting its governance-only interest into a financial interest by purchasing half of OR Holding's rights.  To exercise the conversion option, the Debtor had to repay at least half of the loans that it had received from OR Holding.  The agreement also provided OR Holding with a call-option to divest the Debtor's interest in ATFS.

The Debtor transferred its trade names and marks, including its "The Fund" trade name to its parent, Attorneys' Title Insurance Fund ("ATIF Trust" or the "Trust"), and publicly recorded the transfer.  It did so "to protect and insulate its [IP]" from OR Holding during the amended joint venture agreement negotiations.  Notably, the Debtor remained solvent at the time of the transfer.

The amended agreement also altered ATFS's ability to earn income and its rights to the title plant.  Rather than receiving a percentage of the premiums from the policies that OR Title issued, ATFS received reimbursement for its expenses, capped at 50 percent of the net premiums.  The amended agreement provided the Debtor with a conditional right to the title plant.  The Debtor's right to receive a copy of the title plant was conditioned on ATFS's dissolution, OR Holding's exercise of its call-option, or the

Debtor's exercise of the conversion option. The FL-OIR and the Debtor's board of directors approved the amended joint venture agreement, which became effective in October 2011.

### C. *Master Agreement Transactions*

In fall 2015, the Debtor suffered another financial crisis. The Debtor's statutory surplus—the value of its assets over its liabilities—declined again, and the FL-OIR notified the Debtor that it would refer it to the Florida Department of Financial Services to place it in a receivership. The Debtor sought help from OR Title regarding its financial challenges and requested that the insurer reinsure its title policy liabilities. After conducting its own due diligence, OR Title agreed to reinsure the Debtor's title policy liabilities. During the same period, SOBC Corp., an unaffiliated entity, offered to purchase all of the Debtor's stock for $1.00 and the cost of closing the deal.

After considering the three options before it—receivership, SOBC's offer, and OR Title's reinsurance proposal, the Debtor's board voted to proceed with OR Title's reinsurance proposal. FL-OIR only approved of the proposal after OR Title agreed to assume more of the Debtor's reinsurance liabilities. To implement OR Title's proposal, the Debtor, the Trust, OR Title, OR Holding, Old Republic International Corporation,[2] and ATFS entered into a Master Agreement. OR Title assumed all the Debtor's policy and

---

[2] Old Republic International is a publicly traded company, which directly or indirectly holds all rights, titles, and interest in OR Holding, OR Title, and OR Companies.

reinsurance liabilities, and the Debtor gave up its contingent rights to the title plant, pursuant to the Master Agreement. The Trust also transferred the trade names and marks, including "The Fund," to OR Title. In exchange, the Debtor transferred assets valued at approximately $47.5 million to OR Title.

The parties executed the Master Agreement on December 12, 2015. The FL-OIR requested that OR Title assume additional policy-related liabilities, namely the Debtor's reinsurance obligations, which the parties incorporated into the Master Agreement. Once the parties finalized the Master Agreement, the Debtor resumed administering the claims that it retained under the Agreement. During the same period, OR Title administered and paid claims on the Debtor's policy liabilities that it had assumed.

In January 2016, OR Holding exercised its call-option to divest the Debtor's ownership interest in ATFS to the Trust for no consideration. OR Holding became the sole shareholder with financial interests; all of ATFS's employees became OR Title's employees; and ATFS began leasing its office space from OR Title instead of the Debtor. Consequently, OR Defendants began operating ATFS and its title policy business as "The Fund."

### D. The Debtor's Chapter 11 Bankruptcy Case

On March 2, 2017, the Debtor voluntarily filed for Chapter 11 bankruptcy. The bankruptcy court confirmed a reorganization plan for the Debtor and appointed Daniel Stermer as the Creditor Trustee. In October 2018, the Creditor Trustee initiated an adversary proceeding against OR Defendants and ATFS, alleging that

under the Master Agreement, OR Defendants did not pay the reasonably equivalent value in exchange for the Debtor's cash and investments, intellectual property, and real estate. The Creditor Trustee also brought claims against OR Holding and OR Companies[3] under the theory of successor liability, seeking a declaratory judgment that ATFS was the alter ego of those entities.

> i.    *Parties' Cross-Motions for Summary Judgment*

OR Defendants and ATFS moved for summary judgment on the Creditor Trustee's claims. The Creditor Trustee then moved for partial summary judgment, arguing that undisputed facts showed that the Debtor fraudulently transferred its assets to OR Defendants in violation of the Bankruptcy Code and that ATFS—merely the Debtor's reincarnation—should be liable to the Debtor's creditors. The bankruptcy court bifurcated the proceedings to first conduct a limited trial on whether the Debtor received reasonably equivalent value for the assets that it transferred to OR Defendants pursuant to the Master Agreement. The parties stipulated that the value of the Debtor's tangible assets was approximately $47.5 million. Therefore, the only remaining issues at trial were: (1) the value of the intangible assets that the Debtor transferred, including rights to the title plant and its "The Fund" trade name, workforce, patents, software, and technology; and (2) the

---

[3] The parties' "Joint Pre-trial Stipulation" identifies OR Companies as being "created in 2016 as a mid-stream company for all of OR Holding's title insurance service related businesses but not its title insurers. Since its inception . . . , OR Companies [has been] owned by OR Holding."

value that the Debtor received under the Master Agreement from OR Title's assumption of the Debtor's title policy and reinsurance liabilities.

### ii.    *Evidentiary Rulings*

Prior to trial, the Creditor Trustee retained Allen Pfeiffer to opine on the value of the Debtor's intangible assets. Pfeiffer submitted a written expert report. To value the Debtor's intangible assets, Pfeiffer used the "premium over tangible equity" approach. Under that method, Pfeiffer based his estimates of the Debtor's revenue on the issuance of new title policies even though, pursuant to the joint venture agreement, the Debtor was no longer issuing such new policies. He then applied a "premium over tangible equity" multiple to estimate the value of the Debtor's intangible assets.

He opined that the value of the Debtor's intangible assets totaled $80 million. He further opined that the value of the title plant was approximately $30 million. Pfeiffer's report also asserted that the Debtor could become a title insurer again by exercising its option to exit the joint venture, but to exercise this option, the Debtor would first have to raise $21 million to repay ATFS and OR Defendants pursuant to the amended joint venture agreement.

OR Defendants moved to exclude Pfeiffer's testimony and report as unreliable and too speculative. According to OR Defendants, Pfeiffer's report surmised the Debtor could raise substantial equity capital to exercise its $21 million option to reemerge despite the Debtor's admissions that it had no such ability at the time. They also argued that Pfeiffer's suggestion that reemergence funds

could come through insolvency proceedings was also conjectural because the Debtor could not initiate insolvency proceedings of its own volition. The bankruptcy court partially granted OR Defendants' motion to exclude Pfeiffer's testimony. It struck the portions of Pfeiffer's report that discussed the value of the Debtor's option to exit the joint venture and reemerge as a title insurer, finding that Pfeiffer's opinion on this matter was speculative. The court also precluded Pfeiffer from testifying at trial about the value of the reemergence option but ruled that Pfeiffer could testify at trial about the value of the title plant and the Debtor's intangible assets. It explained that the value of the title plant and intangible assets were not premised on the same flawed methodology as the reemergence option. The court further ruled that OR Defendants and ATFS could proffer rebuttal expert testimony at trial to help "the [c]ourt's consideration of whether Pfeiffer's opinion satisfies the *Daubert* standards."

### iii.    Trial on Reasonably Equivalent Value

After ruling on the expert testimony issues, the bankruptcy court conducted a six-day trial on the first issue of whether the Debtor received the reasonably equivalent value of the intangible assets it transferred to the OR Defendants.[4] Pfeiffer, for his part,

---

[4] Following the bankruptcy court's evidentiary rulings, the Creditor Trustee moved to amend the complaint pursuant to Fed. R. Civ. P. 15(b) to also allege a fraudulent mediate transfer of intellectual property from the Debtor to the Trust. *See Watts v. MTC Dev., LLC (In re Palisades at W. Paces Imaging Ctr., LLC)*, 501 B.R. 896, 916-17 (Bankr. N.D. Ga. 2013) (identifying a "mediate transferee" as the subsequent recipient of property following an initial transfer between a

maintained that the value of the intangible assets transferred amounted to $80 million, but he acknowledged that his calculations were not based on any textbooks or treatises that supported the "premium over tangible equity" method he employed.

OR Defendants and ATFS proffered a rebuttal expert, Steven Hazel. Hazel testified that Pfeiffer's valuation of the Debtor's intangible assets was flawed because it was not based on reliable

---

transferor and transferee). The bankruptcy court denied the motion as futile because (1) the property transfer happened outside the relevant scope of time, and (2) there was no fraudulent transfer. The district court agreed.

Although the Creditor Trustee challenges the denial of his motion on appeal, the brief devotes little space to the issue, and the bankruptcy court's assessment was correct. The Master Agreement between OR Defendants and the Debtor was, as we will explain, for a reasonably equivalent value, meaning it was not fraudulent. Also, the statute of limitations under the Bankruptcy Code and Florida law barred the Creditor Trustee's fraudulent transfer claim. The Creditor Trustee could not rely on the FDIC's six-year statute of limitations for fraudulent transfers (*i.e.*, the FDIC "extender" statute) because that statute of limitations applies only to claims that arose before the FDIC was appointed as receiver. *See Resol. Tr. Corp. v. Artley*, 28 F.3d 1099, 1101 (11th Cir. 1994) (quoting *F.D.I.C. v. Dawson*, 4 F.3d 1303, 1309 (5th Cir. 1993) (explaining that 12 U.S.C. § 1821(d)(14) cannot "revive stale state law claims acquired by the FDIC . . . . [T]he [bankruptcy] court must first determine whether the claims being brought" by the party seeking to invoke the extender statute of limitations "were viable under the applicable state statute of limitations at the time the [FDIC] was appointed receiver. If the state statute has not yet run, the [six-year] period provided by 12 U.S.C. § 1821(d)(14)(A) then begins to run.")). At the time that the FDIC was appointed as receiver over Washington Mutual Bank, which is one of the Debtor's creditors who sought damages resulting from the Debtor's alleged fraud, the mediate transfer claim had not accrued, rendering the extender statute of limitations inapplicable.

12                    Opinion of the Court                    23-10850

principles nor was his methodology widely accepted in the valuation and appraisal industry.  One of Hazel's main critiques was that Pfeiffer provided a collective valuation for all the intangible assets rather than breaking down the value of each individual intangible asset.

Following trial, the court ruled that the Creditor Trustee failed to satisfy his burden of proof to establish that the Debtor received less than reasonably equivalent value for the Master Agreement transaction.  The court first recognized the undisputed fact that the Debtor transferred tangible assets valued at $47.5 million in exchange for OR Title's assumption of the Debtor's title insurance policy liabilities, which had a value between $45 million and $57.2 million.  Next, the court determined that the Master Agreement stripped the Debtor of assets which Pfeiffer's $80 million valuation nevertheless included, thus making his overall estimate overinclusive and flawed.  If, as the court concluded, Pfeiffer had only valued those assets the Debtor actually possessed as of the date of the Master Agreement, the total would be a lot less.  The court further determined that, at the time the Debtor transferred its title plant rights under the Master Agreement, it held merely a conditional interest or right to the title plant.  Therefore, the court reasoned, the Creditor Trustee failed to account for the diminished value of the Debtor's right to the title plant as of the date the Master Agreement took effect.

The court further found Pfeiffer's opinion *ipse dixit*[5] because he failed to establish that his testimony and opinions were based on reliable principles and valuation methodologies. Accordingly, the court did not give any weight to his testimony and opinion. The court reasoned that, although Pfeiffer initially appeared to possess specialized knowledge, his testimony revealed that he did not possess any certifications or other credentials as an appraiser or valuation expert, and he did not "rely on textbooks" when valuing the assets subject to the Master Agreement. The court concluded that Pfeiffer's experience was limited to estimating the value of title companies with a title plant, not just the value of a title plant alone.

Ultimately, the court found that the Debtor had received reasonably equivalent value in exchange for its tangible assets. In making its determination, the court focused on the parties' stipulation that the value of the Debtor's tangible assets was approximately $47 million, that the value of OR Title's assumption of title insurance liabilities was between $45 and $57 million, and circuit precedent.[6] Thus, the bankruptcy court found that OR Title's

---

[5] *Ipse dixit* refers to something that has been "asserted but not proved." *Ipse Dixit*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (explaining that "nothing in . . . the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

[6] The bankruptcy court cited *Crumpton v. Stephens* (*In re Northlake Foods, Inc.*), 715 F.3d 1251, 1257 (11th Cir. 2013), in which we recognized that "[t]he

14                    Opinion of the Court                    23-10850

reinsurance of the Debtor's title policy liabilities in return for the Debtor's tangible assets constituted an exchange of reasonably equivalent value.

    *iv.    Summary Judgment Order*

Next, the bankruptcy court addressed: (1) whether the Debtor made the Master Agreement transfers to OR Defendants with the actual intent to hinder, delay, or defraud its creditors; (2) whether ATFS qualified as the Debtor's successor in interest under the Creditor Trustee's "*de facto* merger" and "mere continuation" theories such that it should be responsible for the Debtor's liabilities; and (3) whether ATFS served as OR Holding's or OR Companies' alter ego.

The court found that the Creditor Trustee could not recover the Debtor's transfers to ATFS under the Master Agreement because the Creditor Trustee failed to prove that the Debtor entered into the transaction with a fraudulent intent. The court found that: (1) the Master Agreement transfers constituted substantially all the Debtor's assets; (2) the Debtor faced the threat of suit prior to making the transfers; and (3) the Debtor was insolvent or became insolvent because of the transfers. However, it ultimately concluded that the transfers were made for the legitimate, independent purpose of reinsuring the Debtor's title policy liabilities. The court relied, in part, on the FL-OIR's decision to approve the Master

––––––––––––––––––––––––

concept of reasonably equivalent value does not require a dollar-for-dollar transaction."

Agreement because it was "in the best interest of [the Debtor's] policyholders . . . ." Although the court recognized that some of the facts in the case could suggest the Debtor's intentions were fraudulent, the documented benefits to policyholders were more likely the overriding purpose behind the transfers, outweighing any facts implying otherwise.

As to the successor liability claim, the bankruptcy court found that ATFS did not qualify as the Debtor's successor in interest because the Debtor and ATFS did not share the same assets or continuity of ownership given that the Trust owned the Debtor, whereas the Debtor and OR Defendants owned ATFS. The court further highlighted that the Debtor did not dissolve after ATFS's formation under the 2009 joint venture agreement, and ATFS did not assume the Debtor's title policy liabilities or general operating liabilities under the 2009 joint venture agreement. The bankruptcy court also rejected the Creditor Trustee's alter ego claim. Although it determined that a general issue of material fact existed as to whether OR Holding's control over a majority of seats on ATFS's board of governors, amounted to control over ATFS, the court ruled that the remaining elements of an alter ego claim were not satisfied.

v.    *District Court Judgment*

The Creditor Trustee appealed the bankruptcy court's decision, essentially raising the same arguments he presented below. The district court agreed with the bankruptcy court's factual findings and legal conclusions, and affirmed its decision. According to

the district court, the bankruptcy court did not err in excluding Pfeiffer's testimony given his opinions were based on unreliable principles and methodologies. Evidence from trial also supported the lower court's finding that the parties transacted the Master Agreement for reasonably equivalent value. The district court ruled that the Master Agreement was not a fraudulent transaction, in part because the parties disclosed the Agreement to the FL-OIR, which reviewed and approved the transaction. The court. thus, concluded that the record did not support the Creditor Trustee's claim that the parties entered into the agreement for the purpose of avoiding the receivership.

As to the successor liability and alter ego claims, the district court adopted the bankruptcy court's findings of fact in concluding that ATFS did not qualify as the Debtor's successor in interest. In particular, it reasoned that the Trust's governance-only interest in ATFS was insufficient to establish common ownership. Similarly, the court ruled ATFS did not qualify as any of OR Defendants' alter ego because the mere fact that they shared a joint bank account did not evince that ATFS was organized to mislead the Debtor's creditors or to perpetuate fraud. Accordingly, the court concluded that the bankruptcy court did not err in finding that ATFS was not created or used for a fraudulent or improper purpose.

The Creditor Trustee initiated the present appeal.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents

no genuine issue of material fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Federal Rules of Bankruptcy Procedure incorporate by reference the summary judgment standard from the rules of civil procedure and apply that same standard in adversary proceedings. *See* Fed. R. Bankr. P. 7056.

This Court sits as a second court of review of a bankruptcy court's decisions, independently examining the bankruptcy court's factual and legal determinations and applying the same standards of review as the district court. *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 698 (11th Cir. 2005) (citation omitted). This Court reviews *de novo* conclusions of law drawn by both the district court and the bankruptcy court and reviews the bankruptcy court's factual findings for clear error. *See OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner)*, 115 F.4th 1296, 1303 (11th Cir. 2024). Neither this Court nor the district court "may make independent factual findings." *Law Sols. of Chi. LLC v. Corbett*, 971 F.3d 1299, 1304 (11th Cir. 2020) (quoting *Englander v. Mills (In re Englander)*, 95 F.3d 1028, 1030 (11th Cir. 1996)). Whether a trial court "applied the correct burden of proof is a question of law subject to plenary review." *Abbot v. Perez*, 585 U.S. 579, 607 (2018). However, a factual finding "based on the application of an incorrect burden of proof . . . cannot stand." *Id.*

We review a trial judge's rulings regarding the admissibility of expert testimony and the reliability of that testimony for abuse of discretion. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir.

18                    Opinion of the Court                    23-10850

2004) (*en banc*).  A trial court abuses its discretion if it misapplies the law, fails to follow required procedure, bases its decision on clearly erroneous facts, or clearly errs in judgment.  *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  We accord considerable deference to trial judges as to how they determine if an expert is reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The abuse of discretion standard is a constant, which does not relent just because a decision on an expert's testimony is outcome determinative.  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014).  Therefore, unless we find the trial judge's decision to admit an expert witness is manifestly erroneous, we will defer to it.  *Id.*; *see Brown*, 415 F.3d at 1266 ("A court of appeals applying 'abuse-of-discretion' review to [expert testimony] rulings may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136,141–42 (1997).

## III.    DISCUSSION

### A. *The Bankruptcy Court Did Not Err in Excluding,* Sua Sponte, *the Creditor Trustee's Valuation Expert and His Opinion Post-Trial*

Expert testimony must conform to the standards of Federal Rule of Evidence 702.  Under Rule 702, expert testimony is admissible if: (1) the expert is sufficiently qualified to testify on the relevant subject matter; (2) the expert's methodology is reliable according to the standards articulated in *Daubert*; and (3) the expert's testimony will be helpful to the factfinder in understanding the pertinent issues at trial.  *Chapman*, 766 F.3d at 1304; *see Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579, 589–94 (1993) (setting forth factors to guide trial judges in assessing the reliability of an expert's methodology). In applying these three requirements, trial courts act as the gatekeepers of expert testimony. *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015). Their objective is to ensure the factfinder considers technical matters based on reliable expert testimony. *Id.*

To assess the reliability of an expert's testimony, courts consider whether the expert's theory: (1) has been tested; (2) has been subject to peer review and publication; (3) has a tendency to err; and (4) has reached "general acceptance" in the relevant field. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 593–94). An expert may base his or her testimony on professional studies or personal experience, but the testimony must still satisfy the *Daubert* standard to be admissible. *Maiz v. Virani*, 253 F.3d 641, 665, 669 (11th Cir. 2001). The party proffering the expert bears the burden of establishing that the expert's testimony is reliable and, therefore, admissible. *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022). Even so, the admission of expert testimony is within the trial judge's sound discretion. *Id.*

The bankruptcy court properly excluded Pfeiffer's testimony pursuant to Federal Rule of Evidence 702 and *Daubert*. For his testimony to be admissible, Pfeiffer needed a reliable methodology in determining the value of the Debtor's intangible assets. Contrary to the Creditor Trustee's assertion that the bankruptcy

20                    Opinion of the Court                 23-10850

court's reliance on textbooks and treatises is misplaced and an insufficient basis to exclude Pfeiffer's testimony,[7] the bankruptcy court provided a well-reasoned explanation as to why it did not credit his testimony. In addition to finding that Pfeiffer failed to support his use of the "premium over tangible equity" multiple with references to accepted valuation textbooks and treatises, the bankruptcy court explained that Pfeiffer failed to value the Debtor's intangible assets separately. The bankruptcy court reasoned that in assessing the value of the intangible assets as a whole, Pfeiffer improperly included intangible assets that the Debtor no longer possessed once the parties entered into the Master Agreement, making it virtually impossible for the court to determine what portion of his $80 million estimate accurately reflected the Debtor's actual intangible assets. *See Knepfle*, 48 F.4th at 1294 (explaining that a court need not admit opinion evidence if the testimony does not have a justified relationship to the pertinent facts).

The bankruptcy court further explained that Pfeiffer's testimony failed to value the Debtor's rights or interest in the title plant

_____

[7] The Creditor Trustee relies on *Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *13 (D. Ariz. July 20, 2020), to argue that Rule 702 does not require that expert reports quote textbooks and treatises. In *Triant*, the district court found that, although an expert's report did not cite any articles or publications, the expert could still testify at trial because of the expert's qualifications and experience. *Id.* As the district court recognized, *Triant* is distinguishable from the present case. Unlike the *Triant* expert, who held certifications in the relevant field, Pfeiffer testified that he did not hold any certifications or designations as a valuation expert or as an appraiser, and he had never separately valued a title plant. *See id.* at *2.

as of the execution of the Master Agreement. Thus, rather than merely relying on Pfeiffer's failure to reference textbooks and treatises, the bankruptcy court thoroughly explained the flaws in Pfeiffer's methodology. *See* Fed. R. Evid. 702(c); *Daubert*, 509 U.S. at 593–94. Accordingly, the bankruptcy court did not abuse its discretion in affording Pfeiffer's testimony little to no weight because his testimony did not conform to reliability standards under the Federal Rules of Evidence and *Daubert*.

Moreover, the bankruptcy court notified the parties that it would revisit the issue whether Pfeiffer's testimony satisfied the *Daubert* standard post-trial. Prior to trial, the bankruptcy court allowed OR Defendants and ATFS to proffer Hazel as a rebuttal expert on the grounds that "Hazel's rebuttal testimony will be very helpful to the [c]ourt's consideration of whether Pfeiffer's opinion satisfies the *Daubert* standards." In the bankruptcy court's written findings of fact, conclusions of law, and memorandum opinion regarding reasonably equivalent value, the bankruptcy court weighed Hazel's testimony against Pfeiffer's, explaining how Hazel's testimony revealed the fallacies in Pfeiffer's opinion. Thus, the bankruptcy court did consider Pfeiffer's testimony and decided to give it little to no weight only after finding that it failed to satisfy the applicable reliability standards. The bankruptcy court properly exercised its discretion to allow Pfeiffer's testimony, assess his testimony at trial, and subsequently exclude it as unreliable. *See Brown*, 415 F.3d at 1265 (explaining that under the abuse of discretion standard, trial courts enjoy a significant range of choices on evidentiary issues so long as their choices "do[] not constitute clear

error of judgment" (quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989))).  Therefore, we affirm the ruling as to the weight and reliability of Pfeiffer's testimony.

## B. *The Bankruptcy Court Did Not Err in Finding the Creditor Trustee Failed to Demonstrate that the Debtor Fraudulently Transferred Its Assets*

The Bankruptcy Code allows a trustee to "avoid any transfer . . . of an interest of [a] debtor in property, or any obligation . . . incurred by the debtor," if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud" its creditors. 11 U.S.C. § 548(a)(1)(A).  The Creditor Trustee argues that the bankruptcy court erred in ruling that he had not established the Debtor's fraudulent intent or met his burden of proof concerning whether the Debtor received less than reasonably equivalent value in exchange for its assets.  We disagree.

Because fraudulent intent remains difficult to prove by direct evidence, courts may look to circumstantial evidence to reasonably infer if fraud occurred.  *Dionne v. Keating* (*In re XYZ Options, Inc.*), 154 F.3d 1262, 1271 (11th Cir. 1998).  Fraudulent transfer claims brought under the Bankruptcy Code and state law may be analyzed at the same time because they are often similar in their procedure and substantive law.  *Kapila v. SunTrust Mortg.* (*In re Pearlman*), 515 B.R. 887, 894 (Bankr. M.D. Fla. 2014).

Florida courts consider the following eleven factors, or "badges of fraud," to determine whether a debtor made a transfer with the actual intent to hinder, delay or defraud a creditor:

    a.  The transfer or obligation was to an insider.

    b.  The debtor retained possession or control of the property transferred after the transfer.

    c.  The transfer or obligation was disclosed or concealed.

    d.  Prior to the transfer, the debtor had been sued or threatened with suit.

    e.  The transfer was of substantially all the debtor's assets.

    f.  The debtor absconded.

    g.  The debtor removed or concealed assets.

    h.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred.

    i.  The debtor was insolvent or became insolvent shortly after the transfer was made.

    j.  The transfer occurred shortly before or shortly after the debtor incurred a substantial debt.

    k.  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105(2); *Levine v. Weissing* (*In re Levine*), 134 F.3d 1046, 1053 (11th Cir. 1998).

The badges of fraud are not exclusive, and courts may consider other evidence to determine a debtor's intent. *In re Jennings*, 332 B.R. 465, 469 (Bankr. M.D. Fla. 2005). Courts must weigh the

24                    Opinion of the Court                    23-10850

facts surrounding the exchange and assess any intent to delay or hinder a creditor in full context rather than in a vacuum. *Id.* Further, a plaintiff need not prove every badge of fraud to prevail on his claim. *See Off. Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 128 (Bankr. M.D. Fla. 2000) (noting the "confluence of several" badges is sufficient for "conclusive evidence of an actual intent to defraud" (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991))). Therefore, even when the statutory factors for fraud are present, courts need not necessarily presume actual intent "where a debtor had legitimate or independent reasons or purposes for making the transfer." *Stewart v. Stewart (In re Stewart)*, 280 B.R. 268, 283 (Bankr. M.D. Fla. 2001) (citation omitted).

The Creditor Trustee maintains that he established fraudulent intent by showing, to the court's satisfaction, that: (1) the Master Agreement transferred substantially all the Debtor's assets; (2) the Debtor had been sued or threatened with suit before the Master Agreement transaction; and (3) the Debtor was insolvent or became insolvent because of the Master Agreement. Those badges of fraud alone, he argues, were sufficient to conclude the transfer was unlawful. The Creditor Trustee also argues that he showed concealment, that OR Title was an insider, and that the Debtor did not receive reasonably equivalent value for the transferred assets. We review the contested badges of fraud in turn.

> i.  *Creditor Trustee failed to establish that the Debtor's transfer of assets was concealed.*

One indica of fraudulent intent is when a debtor conceals its transfer of assets.  Fla. Stat. § 726 105(2)(c).  The Creditor Trustee contends that the parties camouflaged the Master Agreement transaction because, although they disclosed the Master Agreement to the FL-OIR, they did so under a trade secret designation to prevent public disclosure to the Debtor's creditors.

The parties indeed submitted the initial Master Agreement to FL-OIR with trade secret protections, but then they filed the final Master Agreement with far fewer such protections.  The evidence shows that the FL-OIR heavily scrutinized the Master Agreement before approving it.  In fact, the FL-OIR rejected the parties' initial proposal and conditioned its approval on OR's assumption of additional reinsurance liabilities beyond the parties' initial proposal.  The parties then revised the Master Agreement to satisfy the FL-OIR's requests, leading to its ultimate approval of the Master Agreement transaction.  Additionally, the deeds for the real property that the Debtor transferred to OR Title pursuant to the Master Agreement were publicly recorded.  *See Crews v. Carwile* (*In re Davis*), 138 B.R. 106, 109 (Bankr. M.D. Fla. 1992) (finding that the debtor's transfer of revisionary interests in a mortgage was not concealed because it appeared in the public records).  Thus, nothing in the record demonstrates that the Debtor concealed the Master Agreement transaction from its creditors or the public.

ii.  *The Creditor Trustee failed to establish that OR Title was an insider.*

Insider status, another badge of fraud, is one of the most serious indications of fraud.  Indeed, a court may find that an insolvent debtor's transfer to an insider constituted a fraudulent transfer even if no other badges of fraud exist.  *See In re Toy King Distribs., Inc.*, 256 B.R. at 128–29.  A corporation may qualify as an insider of another corporation by statute or if the two entities share a close relationship.  *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1499 (11th Cir. 1997).  An example of a close relationship between corporations is when both corporations are under the control of the same officers and directors.  *In re Toy King Distribs.*, 256 B.R. at 128.

The Creditor Trustee contends that OR Title qualifies as an insider.  In support of this proposition, he relies upon *In re Florida Fund of Coral Gables*, an unpublished opinion in which we recognized that "[t]he cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *See Mia. Police Relief & Pension Fund v. Tabas (In re Fla. Fund of Coral Gables, Ltd.)*, 144 F. App'x 72, 75 (11th Cir. 2005) (quoting *Browning Ints. v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992)).  The transferee in *In re Florida Fund of Coral Gables* received the disputed transfers by coercing the debtor's principal—a longtime associate of the transferee—into making payments after the

transferee discovered that the debtor was engaged in a Ponzi scheme. *Id.* at 73–74.

Such a relationship does not exist between the Debtor and OR Title. The Debtor and OR Title have always had separate ownership. The Trust controlled the Debtor, whereas OR Holding controlled OR Title. In addition, both the Debtor and OR Title were represented by separate counsel during the Master Agreement negotiations. The Debtor considered the SOBC's offer in conjunction with OR Title's proposal, and the Debtor's independent board of directors chose to enter into the Master Agreement. Thus, nothing in the record shows that the OR Defendants coerced the Debtor into entering the Master Agreement. Rather, the evidence demonstrates that the Debtor and OR Defendants had a well-documented business relationship and conducted the Master Agreement transaction at arms' length.

> iii.   *The Creditor Trustee failed to meet his burden of proof regarding the Debtor's exchange for reasonably equivalent value.*

A third badge of fraud is the debtor's failure to receive reasonably equivalent value in exchange for transferring an asset. The concept of reasonably equivalent value in § 726.105(2)(h) does not require an exact dollar amount in exchange for property. *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013). Instead, courts may review the totality of the circumstances in determining whether a debtor received reasonably equivalent value in exchange for a transfer it made or an obligation it incurred.

*Off. Comm. of Unsecured Creditors v. State of Florida* (*In re Tower Env't, Inc.*), 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998). The party challenging the transfer has the burden of proving reasonably equivalent value, *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588, 593–94 (11th Cir. 1990), and the party must establish that the transfer was fraudulent by a preponderance of the evidence. *O'Halloran v. Harris Corp.* (*In re Teltronics*), 540 B.R. 481, 485 (Bankr. M.D. Fla. 2015).

The parties do not dispute that the Debtor held a contingent right in the title plant conditioned upon the occurrence of certain events that had not occurred as of the Master Agreement transaction date. The Debtor could not have transferred absolute rights to the title plant to OR Title when it held only a contingent right. *See Chase & Sanborn Corp.*, 904 F.2d at 593–94 (explaining that "[i]t is well established . . . that a contingent liability cannot be valued at its potential face amount; rather, it is necessary to discount it by the probability that the contingency will occur and the liability become real" (internal citation and quotation marks omitted)). Even so, the Creditor Trustee introduced evidence of the overall value of the title plant and failed to present evidence regarding the value of the Debtor's contingent right to the title plant. Thus, because the Creditor Trustee failed to present evidence on the Debtor's contingent right to the title plant, he failed to meet his burden of proof on its value. *See, e.g.*, *Pettie v. Ringo* (*In re White*), 559 B.R. 787, 802 (Bankr. N.D. Ga. 2016) (finding that "the chance of [the d]ebtor receiving title to the [property] was remote" and, thus, the trustee failed to carry his burden to prove that the debtor

transferred a contingent interest in the property for less than reasonably equivalent value); *In re Teltronics*, 540 B.R. at 485–87 (finding that the trustee failed to establish the value of the debtor's waiver of right to block a patent portfolio sale where the trustee presented evidence of the value of the patent portfolio as a whole, which the debtor did not own).

Further, the Creditor Trustee's evidence of the value of the Debtor's intangible assets had material flaws. For example, the Creditor Trustee's valuation included assets that the Debtor no longer owned at the time of the Master Agreement. For instance, the $80 million valuation included workforce that the Debtor transferred to ATFS in 2009 pursuant to the joint venture agreement. Additionally, the $80 million valuation of the Debtor's assets included the title plant and the trademarks. However, the Debtor transferred the trademarks to the Trust, and the Trust—not the Debtor—transferred those assets to OR Title. Further, the $80 million valuation did not account for the Debtor's discounted right to the title plant.

Ultimately, we are left with the tangible assets that OR Title and the Debtor exchanged. The parties stipulated that the value of the tangible assets that the Debtor transferred to OR Title was approximately $47.5 million. In exchange for the Debtor's assets, OR Title assumed the Debtor's title insurance liabilities which the bankruptcy court valued within a range of $45 million to $57.2 million. Thus, the Creditor Trustee failed to meet his burden of proving that the assets that the Debtor transferred to OR Title were

worth more than the liabilities that OR Title assumed in exchange for the assets. *See In re Northlake Foods, Inc.*, 715 F.3d at 1255.

> iv.    *The Debtor transferred its assets to OR Title for a legitimate purpose.*

Lastly, we may not presume a debtor had actual intent to defraud its creditors when it had "legitimate or independent" reasons for transferring assets. *See In re Stewart*, 280 B.R. at 283. The Debtor transferred its assets pursuant to the Master Agreement for the legitimate purpose of reinsuring its title policy insurance liabilities. After scrutinizing the Master Agreement, the FL-OIR determined that it was in the best interest of the Debtor's policyholders and approved it.

Thus, based on the record before it and the totality of the circumstances, the bankruptcy court did not err in finding that the Creditor Trustee did not prove the Debtor acted with actual intent to defraud its creditors. Accordingly, the record does not support a finding that the Master Agreement transaction constituted a fraudulent transfer.[8]

---

[8] Prior to trial, the bankruptcy court issued a discovery order, finding that the Creditor Trustee had established a prima facie case for fraudulent intent. The discovery order compelled OR Defendants' counsel during the Master Agreement negotiations to produce privileged communications and documents under the crime-fraud exception to attorney-client privilege. On appeal, the Creditor Trustee argues that the bankruptcy court's crime-fraud ruling is irreconcilable with its summary judgment order finding that he failed to satisfy his burden of proving that the Master Agreement constituted a fraudulent transfer. The Creditor Trustee's argument is unpersuasive because the

C. *The Bankruptcy Court Did Not Err in Granting Summary Judgment in OR Defendants' and ATFS's Favor on the Creditor Trustee's Successor Liability and Alter Ego Claims*

    i.   *Successor Liability Claim*

Under Florida law, a successor corporation does not assume its predecessor's liabilities unless (1) the successor assumes the obligations of its predecessor, (2) the transaction is a *de facto* merger, (3) the successor merely continues its predecessor's business, or (4) its transactions are intended to defraud and avoid its predecessor's liabilities. *Bernard v. Kee Mfg. Co.*, 409 So. 2d 1047, 1049 (Fla. 1982).

The Creditor Trustee argues that summary judgment on his successor liability claim was inappropriate, whether analyzed as a *de facto* merger or under a mere continuation theory. A *de facto* merger is when one entity absorbs another without adhering to the statutory requirements for a merger. *Lab'y Corp. of Am. v. Pro. Recovery Network*, 813 So. 2d 266, 270 (Fla. Dist. Ct. App. 2002). A party seeking to establish that a *de facto* merger occurred must show that (1) the two corporations share the same management, personnel, assets, and physical location; (2) there is continuity of ownership; (3) the predecessor corporation was dissolved; and

---

parties' presentation of evidence during the trial demonstrated that the Debtor transferred its assets for reasonably equivalent value. *See Mejia v. Ruiz*, 985 So.2d 1109, 1113 (Fla. Dist. Ct. App. 2008) ("The existence of badges of fraud create a prima facie case and raise a rebuttable presumption that the transaction is void." (citation omitted)). During the trial and on summary judgment, OR Defendants sufficiently rebutted the presumption that the Master Agreement constituted a fraudulent transfer.

(4) the successor corporation assumed the predecessor corporation's liabilities. *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 153–54 (Fla. Dist. Ct. App. 1994). The elements do not have to exist at the same time for a *de facto* merger to occur. *See id.* at 154.

Under the mere continuation theory, the successor corporation is merely the predecessor corporation continued under a different name. *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985). Mere continuation occurs when two corporations have a change in form but not in substance. *In re All Sorts of Servs. of Am., Inc.*, 631 B.R. 63, 72 (Bankr. M.D. Fla. 2021). One key element is the new corporation will have a common identity, marked by the same officers, directors, and stockholders that were a part of the predecessor corporation. *Bud Antle*, 758 F.2d at 1459. Ultimately, the test for the existence of a *de facto* merger and mere continuation "is whether each entity has run its own race, or whether, there has been a relay-style passing of the baton from one to the other." *Azar*, 648 So. 2d at 154 (citation omitted).

Here, ATFS does not qualify as the Debtor's successor in interest under the *de facto* merger or mere continuation theories. The Creditor Trustee satisfied only one of the four elements necessary to show that a *de facto* merger occurred under the 2009 joint venture agreement. The parties do not dispute that under the 2009 joint venture agreement, 544 of the Debtor's 568 employees, including senior officers, became ATFS's employees. Thus, the Debtor and ATFS had the same management and personnel. *See id.* at 153–54. Additionally, the two entities operated from the same

23-10850                Opinion of the Court                33

physical location because ATFS leased the Debtor's office space. *See id.* However, the Debtor and ATFS did not have the same assets. Although the Debtor gave ATFS a copy of the title plant, licensed its "The Fund" name to ATFS, and provided a majority of its workforce to ATFS pursuant to the 2009 joint venture agreement, the Debtor still retained its own assets valued at approximately $240 million. Thus, the Debtor and ATFS did not share the same assets following their execution of the 2009 joint venture agreement.[9] *See id.*

Further, the Debtor and ATFS did not share common ownership. *See id.* Although identical ownership is one way, among others, to establish successor liability, some overlap of ownership between the predecessor and successor corporations does not automatically confer successor liability. *See id.* at 154 (explaining that "the new [company] is the old [company] dressed up with a new name and controlled by the same [people]"). Here, the Trust

---

[9] The Creditor Trustee relies on *Murphy & King Pro. Corp. v. Blackjet, Inc.*, No. 13-80280-CIV-HURLEY, 2016 WL 3017224, at *5 (S.D. Fla. May 26, 2016), to argue that Florida law does not require that two corporations have the same assets to establish successor liability. The Creditor Trustee contends that Florida law only requires a sufficient overlap of assets to establish successor liability. The Creditor Trustee is correct. *See id.* (finding that "for all practical purposes" there had been a transfer in assets despite no actual transfer taking place). However, *Murphy* is distinguishable from the current case. In *Murphy*, the Debtor's predecessor ceased operations entirely and dissolved itself after transferring its assets. *Id.* Here, the Debtor maintained $240 million in assets and continued to operate after transferring its other assets. Thus, ATFS and the Debtor did not *de facto* merge assets from one entity to another as the predecessor entity shuttered its operations.

wholly owned the Debtor and, following the 2009 joint venture agreement, the Debtor and OR Holding owned ATFS. The two were only briefly on equal footing. The 2011 amended joint venture agreement converted the Debtor's ownership shares in ATFS into governance-only shares, giving OR Holding all the financial rights to ATFS. In addition to the financial rights, OR Holding attained a call option, which gave it the right to acquire the Debtor's governance-only shares. In January 2016, OR Holding exercised that option and wholly divested the Debtor of all its ATFS shares. Although OR Holding later transferred the shares to the Trust, the Trust still did not have any financial rights to ATFS. So, although the Debtor and the Trust had ownership in ATFS, neither held a financial interest within ATFS. Thus, the Debtor did not "control" ATFS, despite its common ownership.

Furthermore, the Debtor did not dissolve because of the joint venture agreement. *See id.* at 153–54. The Debtor did not file for bankruptcy until 2017—eight years after transferring assets to ATFS under the 2009 joint venture agreement. Even though the Debtor has ceased operations and is proceeding through the bankruptcy process, the Debtor has not formally dissolved. *See id.* at 154 (finding that "the technical requirement of dissolution of the predecessor corporation was not established" where the predecessor medical professional association "had essentially ceased operations other than receiving accounts receivable" but had not formally dissolved at the time of the bankruptcy proceedings).

Also, ATFS did not assume a sufficient portion of the Debtor's liabilities to establish successor liability. *See id.* ATFS sublet the Debtor's branch locations and directly leased space within its Headquarters Building. The office spaces, however, represent a small fraction of the Debtor's tangible assets, which the parties stipulated were worth approximately $47.5 million. As mentioned previously, the Debtor retained approximately $240 million in assets following the joint venture agreement. Thus, the Creditor Trustee failed to establish successor liability under a *de facto* merger theory.

Similarly, the Creditor Trustee failed to establish successor liability under a mere continuation theory. *See In re All Sorts of Servs. of Am.*, 631 B.R. at 73. The Debtor and ATFS represented separate and distinct entities. *See Azar*, 648 So. 2d at 154. Although they operated similar businesses such as maintaining a copy of the title plant, ATFS and the Debtor did not share common ownership or the same assets, and ATFS did not assume a substantial portion of the Debtor's liabilities. ATFS is, thus, not a "mere continuation" of the Debtor.

Accordingly, the bankruptcy court did not err in ruling that the Creditor Trustee failed to establish successor liability.

ii.    *Alter Ego Claim*

Under Florida law, an alter ego claim allows a creditor to seek judgment against a debtor corporation or its related entities when the debtor has attempted to mislead or defraud the creditor by taking another corporate form. *Webber v. Patel* (*In re Patel*), 632

B.R. 903, 911 (Bankr. M.D. Fla. 2021). Florida law does not distinguish between the alter ego/instrumentality theory and the doctrine of piercing the corporate veil. *In re Homelands of DeLeon Springs, Inc.*, 190 B.R. 666, 670 (Bankr. M.D. Fla. 1995). A party seeking to pierce the corporate veil must prove by a preponderance of the evidence that (1) the shareholder controlled the corporation such that there was no true distinction between the shareholder and the corporation—the two were alter egos, (2) the corporate alter ego was used improperly, and (3) its improper use harmed creditors. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011). Generally, Florida courts will not pierce the corporate veil "absent proof of fraud or ulterior motive by the shareholder[.]" *In re Homelands of DeLeon Springs*, 190 B.R. at 670 (citation omitted).

Here, the Creditor Trustee failed to establish an alter ego claim because he satisfied only one of the three elements necessary to pierce the corporate veil. *See In re Patel*, 632 B.R. at 912. The bankruptcy court properly found that a genuine issue of material fact existed as to the first element—whether OR Holding "dominated and controlled" ATFS. The parties disagreed as to whether OR Holding controlled ATFS's board of governors because ATFS's CEO—a board member—later became an OR Title employee, providing OR Holding with a voting majority on the board. However, because the board of governors controlled ATFS's business operations, it is plausible that OR Holding controlled ATFS through its voting majority on the board. Furthermore, following the Master Agreement transaction, all of ATFS's employees

became OR Title's employees.  Thus, OR Holding arguably dominated and controlled ATFS.  *See id.* at 912.

Nevertheless, the Creditor Trustee failed to present evidence that would support a finding that the Debtor and OR Holding formed or operated ATFS for an improper purpose.  *See id.* at 912.  The Debtor and OR Holding formed ATFS for the legitimate purpose of providing ancillary support related to OR Title's issuance and maintenance of new title policies.  Although OR Holding and ATFS shared a bank account and commingled funds in that account, nothing in the record shows that they used the bank account to divert funds from creditors or perpetrate a fraudulent scheme.  *See Robertson-Ceco Corp. v. Cornelius*, No. 3:03cv475/RV/EMT, 2007 WL 1020326, at *5 (N.D. Fla. Mar. 30, 2007) ("Under Florida law, [commingling funds] is not enough" to pierce the corporate veil "unless it is proven that such actions were undertaken specifically for an improper purpose." (emphasis omitted)); *Hillsborough Holdings Corp. v. Celotex Corp.* (*In re Hillsborough Holdings Corp.*), 166 B.R. 461, 469–71 (Bankr. M.D. Fla. 1994) (collecting cases that stand for the proposition that lack of corporate formalities, absent a showing of deliberate misconduct, is insufficient to establish improper use of the corporate form).

Furthermore, the Creditor Trustee failed to show that any alleged improper use of ATFS's corporate form injured the Debtor's creditors.  *See In re Patel*, 632 B.R. at 912.  As the bankruptcy court accurately noted, most of the claims filed in the Debtor's bankruptcy case related to the title policies and arose

before it entered the 2009 joint venture agreement, such as closing protection letters that it administered and other non-policy tort claims. Even after formation of the joint venture, the Debtor continued to administer its existing title policies. *See also PaeTec Commc'ns, Inc., v. Bull* (*In re Bull*), 528 B.R. 473, 493 (M.D. Fla. 2015) (finding that a creditor could not have suffered harm where it failed to establish an improper use of the corporate form); therefore, the bankruptcy court did not err in granting summary judgment in OR Defendants' and ATFS's favor because the Creditor Trustee did not present sufficient evidence to prove that ATFS really was just the OR Defendants' alter ego, thus rendering them liable to the Debtor's creditors.

## III.    CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's order affirming the bankruptcy court's judgment.